PAUL ALSTON       1126-0
TINA L. COLMAN     8321-0
ALSTON HUNT FLOYD & ING
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai`i 96813
Telephone: (808) 524-1800
Email:      palston@ahfi.com
            tcolman@ahfi.com

OSCAR GARZA, CA. SBN 149790 *(admitted pro hac vice)*
KENNETH A. GLOWACKI JR., CA. SBN 217762 *(admitted pro hac vice)*
GIBSON, DUNN & CRUTCHER LLP
4 Park Plaza, Suite 1400
Irvine, California 92614-8557
Telephone: (949) 451-3800
Email:     ogarza@gibsondunn.com
          kglowacki@gibsondunn.com

Attorneys for WAIKIKI FIRST FINANCE CORP. and
 WAIKIKI S.F. LLC

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF HAWAI`I

| | |
|---|---|
| In re | CASE NO. 05-50011 (RJF) |
| | (Chapter 11) |
| AZABU BUILDINGS CO., LTD., a.k.a. | |
| AZABU TATEMONO K.K., | **EXPERT REPORT OF CYNTHIA NELSON** |
| Debtor and | |
| Debtor-In-Possession. | |

## EXPERT REPORT OF CYNTHIA NELSON

DATED: Honolulu, Hawai`i, May 4, 2007.

            _/s/ TINA L. COLMAN_
            PAUL ALSTON
            TINA L. COLMAN
            OSCAR GARZA
            KENNETH A. GLOWACKI JR.
            Attorneys for WAIKIKI FIRST FINANCE
            CORP. and WAIKIKI S.F. LLC

**Azabu Buildings Company, Ltd., a.k.a Azabu Tatemono K.K.,
Debtor and Debtor-in-Possession**

---

Case No. 05-50011

---

Expert Report
of
Cynthia Nelson
Senior Managing Director, FTI Consulting, Inc.

# TABLE OF CONTENTS

Page

I.  **Expert Report**

    A.  Scope of Retention ...................................................................................3

    B.  Summary of Qualifications .......................................................................4

    C.  Opinion ...................................................................................................4

    D.  Information Reviewed and Considered ..................................................11

    E.  Waikiki Entities' Secured Claims, Rights and Treatment Under Plan ..................13

    F.  Bases for Opinion:  Appropriate Rate of Interest .................................17

        1.  Application of *Till* ...........................................................................18

        2.  Market Rate and Test ......................................................................31

    G.  Plan Feasibility Using Appropriate Risk-Adjusted Interest Rate ..........................35

    H.  Declaration of Stephen J. Pearlman ......................................................36

II.  **Expert Qualifications** .....................................................................................39

III.  **Appendix:**  Adjusted Debtor's Cash Flow and Debt Coverage Ratios
      *(contains confidential information; Appendix filed and served separately pursuant to Stipulated Protective Order)*

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1051   Filed  05/04/07   Page 3 of 42

## I. EXPERT REPORT

### A. <u>Scope of Retention</u>

I have prepared this Expert Report (this "Report") in support of objections of Waikiki First Finance Corp ("WFFC") and Waikiki S.F. LLC ("WSFC"), collectively referred to as the "Waikiki Entities," to confirmation of the Debtor's and Official Committee of Unsecured Creditor's Second Amended Joint Chapter 11 Plan of Reorganization for Azabu Buildings Company, Ltd., a.k.a. Azabu Tatemono K.K., and Subsequent Filing Entities, dated April 23, 2007 (the "Joint Plan" or "Plan") filed by Azabu Buildings Company, Ltd., a.k.a. Azabu Tatemono, K.K., the Chapter 11 Debtor and Debtor-in-Possession (the "Debtor") and Official Committee of Unsecured Creditors (collectively with the Debtor, the "Joint Plan Proponents"). The Waikiki Entities are mortgagees of the Debtor, and hold priority liens against the Debtor's assets, including, but not limited to, the leasehold interest in the Hyatt Regency Waikiki Resort & Spa ("Hotel"), all Hotel-related personal property assets of the Debtor (collectively, the furniture, fixtures and equipment or "FF&E"), and cash or cash equivalents held in certain bank accounts (collectively, the "Lock Box") at The Chuo Mitsui Trust and Banking Company, Limited ("CMBT"), in Tokyo, Japan. I have been asked to analyze the proposed treatment of the Waikiki Entities' claims under the Plan[1] in order to determine the interest rate necessary for the payments made on account of these claims to equal their present value.[2]

---

[1] The Plan classifies these claims as Class 5 allowed WFFC Secured Claim and Class 6 Allowed WSFC Secured Claim, collectively referred to herein as "Waikiki Entities' Claims" or "Claims."

[2] For purposes of my analysis, I have been asked by counsel for the Waikiki Entities ("Counsel") to determine the interest rate necessary for the Plan to conform with the cram down provisions of § 1129(b)(2)(A) of the U.S. Bankruptcy Code (the "Code"). I also have been asked to render an opinion as to the market rate of interest applicable to the Waikiki Entities' Claims.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 4 of 42

**B.** **Summary of Qualifications**

I am a Senior Managing Director in the Corporate Finance practice of FTI Consulting ("FTI"). The Corporate Finance practice is the largest professional consulting practice in the United States that deals predominantly with workouts, turnarounds, and bankruptcy reorganizations. In my position with FTI and prior professional career, I have had and continue to have extensive and diversified experience in real estate matters including hospitality, residential, commercial, and other property types in various stages of development ranging from raw land to operating properties. I am familiar with the availability, pricing and terms of debt and equity financings for real estate projects and ventures, including underwriting criteria and procedures for loans on hospitality properties similar to those provided to the Debtor, and have prepared many analyses of the appropriate rates of interest on plans of reorganization. I also frequently conduct real estate valuations, market and cost analyses and financial feasibility analyses. I have testified and assisted in determining the appropriate interest rate in numerous matters involving interest rate and real estate financial issues related to hotels and other types of real estate. A more detailed description of my qualifications and prior testimonial experience is included in Section II of this Report.

**C.** **Opinion**

Based on my analyses, which are described in subsequent sections of this Report, I have reached the following conclusions:

1.  The interest rate proposed to be paid on the secured claims of the Waikiki Entities of three-month LIBOR plus 50 basis points or 5.86%[3] is substantially below an appropriate risk-adjusted or market indicated rate

---

[3] The Plan provides for interest to be paid at the non-default contract rate or such other rate as the Bankruptcy Court determines is necessary to comply with Bankruptcy Code§§ 506(b) and 1129(b). The non-default contract rate is equal to LIBOR plus 50 basis points or 5.86% as of May 1, 2007. I understand that this rate reflects a below-market

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1051   Filed 05/04/07   Page 5 of 42

of interest and hence, the payments provided in the Plan will not provide the Waikiki Entities with the present values of their Claims. In order to compensate the Waikiki Entities for the substantial risk imposed by the Plan, the appropriate risk-adjusted rate of interest, based on application of the formula approach set forth by the Supreme Court in *Till (Till v. SCS Credit Corporation.* 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004)), is the national prime rate, currently 8.25% per annum, plus a risk adjustment of *at least* 300 basis points, and arguably more, for a *minimum interest rate of 11.25%.* This interest rate reflects the risks normally borne by lenders to "prime" borrowers and the incremental risk borne by the Waikiki Entities which results from the Plan. These risks stem primarily from:

> a. *A material change in the nature of the security interests held by the Waikiki Entities and virtual elimination of any rights to enforce remedies in the event of a default by the Debtor or diminution in collateral value:* The Plan calls for elimination of the Waikiki Entities' direct liens against the Hotel, FF&E and Lock Box and replacement with ill-

---

rate that was agreed to by the parties when the loans were restructured in 1996. A settlement was reached among the parties, as set forth in the Basic Agreement, dated September 18, 1996, which, among other things reduces interest payment obligations.

defined liens on certain assets of the Azabu Liquidating Trust and FF&E subsidiary (as defined in the Plan and discussed further herein) with almost no mechanism for enforcement of remedies in the event of default or diminution in collateral value. It also relegates the Waikiki Entities to unsecured creditors in the Japanese plan proceedings, and severely restricts them from participating in these proceedings.

b. *Fundamental risks associated with Plan feasibility*: While the Joint Plan Proponents target December 31, 2007 for the completion of all transactions required under the Plan, they acknowledge it could take longer and that some transactions may not be accomplished. The Plan is contingent upon the successful and timely completion of numerous milestones and transactions, subject to Court approval. At least three of these steps (the Japanese Plan Confirmation, the Domestication Transaction and the sale of NewCo to Hyatt as defined in the Plan) depend on parties other than the Joint Plan Proponents and this Court to effectuate. The highly contingent nature of this Plan increases the risk that it is not feasible, which risk must be accounted for by an adjustment in the interest rate. Moreover, should the Equity Sale to Hyatt not be concluded, the cash flow forecast by the Debtor for the Hotel in 2007, adjusted to take into account additional ground rent and ongoing bankruptcy costs, exceeds debt

[ 6 ]

service by only minimal amounts, amounts which result in debt coverage ratios that are below minimum levels customarily required by hotel lenders and which further increases risk.[4] An increase in the interest rate or an additional $1 million to $3 million of cash from a source external to the Estate (depending on assumptions with respect to increases in the ground rent and calculated based on 5.86%) would typically be required in order to provide the necessary cushion for meeting typical minimum debt coverage ratios.

2. Based upon my experience and the market research I conducted, an interest rate of *at least* 11.25% also is consistent with *minimum* returns the market likely would demand for investments in assets with similar characteristics, security interests and remedies for recovery.

3. At an appropriate interest rate of 11.25%, the Debtor will generate insufficient cash flow to pay monthly debt service to the Waikiki Entities. Based on my adjustments to the Debtor's 2007 forecast for the Hotel (described in the footnote 4), the adjusted NOI for 2007 totals $20.6 million to $22.6 million. This is well below the amount required to pay

---

[4] My calculation of the debt coverage ratio is based on the Debtor's 2007 forecast for the Hotel, adjusted to take into account estimates of potential increases in ground rent on the CK and Okumoto parcels (currently being negotiated and not already accounted for in the Debtor's projections), the sinking fund required in connection with demolition of the Hotel when the ground leases expire in 2047, as well as historical annualized costs of these bankruptcy proceedings of $6.4 million. (Note that these bankruptcy costs do not include costs associated with the proposed Azabu Liquidating Trust or the Japanese bankruptcy proceedings). The adjusted NOI for 2007 totals $20.6 to 22.6 million (depending on estimates for increases in ground rent). Debt service of $19.6 million is calculated at the proposed rate of 5.86%. This results in a debt service coverage ratio of only 1.05 to 1.15 which is below levels customarily required by hotel lenders.

U.S. Bankruptcy Court - Hawaii  #05-50011   Dkt # 1051   Filed 05/04/07   Page 8 of 42

interest on the Waikiki Entities' Claims of $37.6 million, calculated at an appropriate rate of interest of 11.25%.

4.  I also have read the declaration of Stephen J. Pearlman ("Pearlman Declaration") and the rough deposition transcript of Mr. Pearlman's deposition on May 2, 2007 ("Pearlman Deposition Transcript") and have reached the following conclusions.

   a.  *Mr. Pearlman fails to address the material additional risks that are specific to the Plan's treatment of the Waikiki Entities' Claims and therefore his concluded interest rate ranges are too low.*  The market interest rates cited by Mr. Pearlman are based upon traditional loans secured by real property, with customary security instruments, rights and remedies. These traditional loans depart markedly from the Waikiki Entities' Claims under the treatment proposed in the Plan. Mr Pearlman indicates he "looked at" the Plan[5] (although not prior to executing his declaration), but apparently he did not consider it in reaching his conclusions. Because Mr. Pearlman does not take these substantial risks into account, his concluded rates do not provide the Waikiki Entities' the present value of their Claims nor do they bear any reasonable relationship to a market rate. Furthermore, in not accounting for these additional risks, he effectively ignores the instruction of the

---

[5] Pearlman Deposition Transcript, pp. 16-17

[ 8 ]

U.S. Supreme Court in *Till*, a case with which Mr. Pearlman says he is not familiar.[6]

b.  Mr. Pearlman's concluded spreads on floating rate hotel loans are higher than what the Plan proposes (Mr. Pearlman cites a typical range for a floating rate loan of LIBOR plus 140 to 170 basis points, while the Plan proposes LIBOR plus 50 basis points). The non-default contract rate proposed under the Plan is *lower* than the rates Mr. Pearlman concludes are today's market rates for floating rate financing for similar properties, thereby suggesting that higher rates for the Waikiki Entities' Claims are warranted even before taking into account the additional risks associated with the Plan's treatment of the Waikiki Entities' Claims.

c.  In my opinion, the indicated rates for floating rate loans on hotels meeting customary underwriting criteria concluded by Mr. Pearlman merit upward adjustment in order to account for the additional risks associated with ground leases. Mr. Pearlman acknowledges that interest rates for loans on properties subject to ground leases would be higher, but indicates that his quoted range takes this into account.[7] However, neither Mr. Pearlman's declaration nor

---

[6]Pearlman Deposition Transcript, p. 11

[7]Pearlman Deposition Transcript, pp. 29-30, 42

U.S. Bankruptcy Court - Hawaii  #05-50011   Dkt # 1051   Filed 05/04/07   Page 10 of 42

handwritten notes of interviews with lending sources (which were produced at his deposition), make mention that the interest rates quoted are for properties owned in fee as well as for ground leased properties, nor do they indicate any difference in the interest rate that would be charged.

d. Mr. Pearlman says he assumed a 75% to 80% loan-to-value ratio based on the value attributed to the Hyatt Corporation bid but never indicates in his declaration that he adjusted the value to exclude King's Village, which is not collateral for the Waikiki Entities' Claims. His declaration also states that he assumed a first class hotel with positive cash flow. However, he says he did not consider increases in ground rent for the CK or Okumoto parcels, the sinking fund, any increases related to labor costs pursuant to an agreement reached in late 2006 or ongoing costs of the bankruptcy. Consequently, he did not consider whether the Hotel meets customary criteria for debt service after taking into account these additional expenses.[8]

---

[8] Pearlman Deposition Transcript, pp. 22-23, 40, 61. Mr. Pearlman also admits that he only considered increases in the Steiner ground leases after he executed his Declaration on April 16, 2007 (Pearlman Declaration, p. 17).

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 11 of 42

## D.   Information Reviewed and Considered

To prepare this Expert Report, I reviewed and considered the following:

1.  Joint Plan, dated April 23, 2007

2.  First Amended Disclosure Statement, March 16, 2007

3.  Plan Supplement (as defined in the Joint Plan)

4.  Debtor's Motion for Order Approving Settlement with 2424 Kalakaua Associates, April 16, 2007 ("Ground Lease Settlement Motion")

5.  Confidential Offering Memorandum prepared by Houlihan Lokey Howard & Zukin, December 8, 2006 ("Offering Memorandum")

6.  Debtor's Submission of Third Cash Collateral Stipulation, October 20, 2006

7.  Ground Lease Analysis prepared by Houlihan Lokey Howard &Zukin, March 13, 2007

8.  Debtor's Submission of Fourth Cash Collateral Stipulation, April 20, 2007 ("Fourth Cash Collateral Stipulation")

9.  Proofs of Claim submitted by Waikiki SF Corp, June 1, 2006 and Waikiki First Finance Corp, June 1, 2006

10. Debtor-In-Possession Monthly Operating Reports for February 2006 through March 2007

11. Submission of Objection to First Amended Disclosure Statement by WSFC and WFFC, February 21, 2007

12. Amended and Restated Loan Agreement between Azabu Buildings Co., Ltd. and WFFC, November 6, 1996 and Loan Agreement between Azabu Buildings Co., Ltd. and WSFC, November 6, 1996 (the "Loan Agreements") and Basic Agreement, dated September 18, 1996

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1051   Filed  05/04/07   Page 12 of 42

13.     Promissory Note undersigned by Azabu Buildings Co., Ltd. to WSFC, November 6, 1996 and Promissory Note undersigned by Azabu Buildings Co., Ltd. to WFFC, November 6, 1996 (the "Promissory Notes")

14.     Mortgage, Security Agreement and Financing Statement between WSFC and Azabu Buildings Co., Ltd., October 31, 1996 and Amendment, Re Restatement and Consolidation of Mortgage, Security Agreement and Financing Statement between WFFC and Azabu Buildings Co., Ltd., November 6, 1996 (the "Mortgages")

15.     Acquisition Agreement by and between Azabu Buildings Co. Ltd. and Hyatt Corporation, February 7, 2007 ("Acquisition Agreement") and First and Second Amendments thereto

16.     Year-to-Date December 2006 Financial Statements

17.     Debtor's Revised 2007 Hotel Budget

18.     Pearlman Declaration

19.     Pearlman Deposition Transcript

20.     Pearlman handwritten notes (AZ 041978-041987)

21.     Draft of deposition transcript of Junichi Matsushita, April 22, 2007 ("Matsushita Deposition Transcript")

22.     Market data and surveys of typical underwriting and investment criteria for real estate loans and transactions secured by and involving hotel properties; and

23.     My experience, knowledge and understanding of financial markets, debt and equity financing arrangements, underwriting criteria for real estate secured loans, including loans for hotels.

**E.    Waikiki Entities' Secured Claims, Rights and Treatment Under Plan**

According to the Proofs of Claim the Waikiki Entities filed with this Court, the claims for WFFC and WSFC as of the Petition Date were $192,250,000.00 and $137,750,000.00, respectively, or $330,000,000.00 in the aggregate.  I have assumed that the aggregate amount of the Waikiki Entities Claims will total $330,000,000 at Plan Confirmation.  The Waikiki Entities' Claims are secured by first and second priority liens on the Debtor's interest in the Hotel, the proceeds generated by the Hotel, the FF&E related to the Hotel, and the Debtor's Lock Box.

The Hotel (or "Property") is located at 2424 Kalakaua Avenue in the Waikiki district of Honolulu, Hawaii.  The Hotel houses 1,230 rooms in two 40-story towers, and also contains approximately 75,000 square feet of retail space within the Hotel, and another 15,000 square feet of retail space along the front of the Hotel.  The Hotel also includes a convention center and parking lot located across the street, which sit on approximately 25,000 square feet of land.  Hyatt currently manages the Hotel and the current management agreement expires on December 31, 2014.

The Hotel land is leased pursuant to four separate ground leases, all of which expire on December 31, 2047 and all of which call for a readjustment of the annual ground lease payment to market every ten years.  The next adjustment is currently being negotiated by the parties and is effective as of January 1, 2007.

The Debtor's Lock Box consists of approximately $47.6 million of cash held in bank accounts at CMTB in Tokyo, Japan.  The Waikiki Entities assert an interest in all the funds in the Lock Box, including a first priority lien in at least $30 million of these funds, which liens and interests are subject to priority disputes with multiple other creditors.

To summarize at a high level, the Plan calls for the transfer of the Debtor's primary assets into two newly formed, wholly-owned entities, "NewCo" and the "FF&E

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 14 of 42

Subsidiary." The Debtor would sell its ownership interest in NewCo (to Hyatt Corporation) and would use the resulting proceeds to fund a liquidating trust ("Azabu Liquidating Trust" or "Trust") that would be created for the purpose of paying bankruptcy claims against the Debtor. The steps required to effectuate the Plan and the treatment of the Waikiki Entities' Claims are described further below.

NewCo would be formed prior to Confirmation, and the ownership shares in NewCo would be held by the Debtor. In order to resolve any international claims against the Debtor's assets that would ultimately be transferred to NewCo, the Debtor would commence bankruptcy proceedings in Japan (the "Japanese Case") and would file a Japanese Plan of Reorganization ("Japanese Plan") or commence another legal proceeding reasonably acceptable to Hyatt. After entry of the Japanese Confirmation Order and other steps related to the Domestication Transaction, the Debtor would transfer all of its assets to NewCo, with the exception of Excluded Assets,[9] and the Debtor would then be dissolved. Upon the closing of the Equity Sale, the ownership of NewCo would be transferred to Hyatt in exchange for $444.5 million (the "Purchase Price"), which would fund the Azabu Liquidating Trust.

*Prior to Confirmation* and pursuant to Court approval (the "FF&E Order"), the Debtor would form the FF&E Subsidiary and enter into a transaction ("FF&E Sale"), which would cause the Debtor to transfer all of its FF&E to the FF&E Subsidiary in exchange for 100% of the FF&E Subsidiary's common stock and a note ("FF&E Subsidiary Note") that would be secured by a lien on the FF&E ("FF&E Subsidiary Note Collateral"). Hyatt would receive $500

---

[9]  Excluded Assets, as defined in the Plan, means those assets of the Debtor and Azabu USA that are retained by the Debtor and are excluded from the Equity Sale or the FF&E Sale.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed  05/04/07  Page 15 of 42

thousand worth of preferred shares in the FF&E Subsidiary in exchange for management services. The FF&E Order is planned to allow for the Debtor to lease the FF&E back from the FF&E Subsidiary.

The FF&E Sale is the first transaction where the Waikiki Entities' liens are affected. Pursuant to the Plan, under the FF&E Order, *but before Plan Confirmation*, the first and second priority liens that the Waikiki Entities have against the FF&E would be eliminated and replaced with:

1.    a lien on 100% of the stock of the FF&E Subsidiary,

2.    a lien on the FF&E Subsidiary Note, and

3.    a lien on the Debtor's lien on the FF&E Subsidiary Note Collateral (i.e., a lien on a lien).

Afterwards, on the First Confirmation Implementation Date,[10] the Azabu Liquidating Trust will be created and the Excluded Assets, other than the Lock Box, will be transferred to it. At this time, the remaining first and second priority liens that the Waikiki Entities have against the Hotel and the Lock Box would be eliminated, and instead, the Waikiki Entities would be given:

1.    a lien on a $600M note to be issued by the Debtor ("Plan Note") in favor of Azabu Liquidating Trust, and

2.    a lien on Azabu Liquidating Trust's lien on Plan Note Collateral (i.e., another lien on a lien), which includes all of the Debtor's assets excluding the common stock in NewCo and the Excluded Assets.

---

[10]  First Confirmation Implementation Date, as defined in the Plan, reflects the first business day after the expiration of ten days following the Confirmation Date.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 16 of 42

These new liens would stay in place until NewCo pays Azabu Liquidating Trust the Plan Note in full (payment of $444.5 million), with proceeds from the Equity Sale. At that point in time, the replacement liens in favor of the Waikiki Entities would terminate, and the Waikiki Entities would be provided liens on the Azabu Trust Assets, which would then include the Purchase Price proceeds. This new lien would exist until such time that the Waikiki Entities receive full payment of:

1.  the Claims,

2.  accrued and unpaid interest on the Claims at the non-default contract rate from and after the Petition Date, and,

3.  the Waikiki Entities' attorney fees and expenses provided for their contract(s) with the Debtor and as approved by the Court,

4.  less the sum of the adequate protection payments[11] received by the Waikiki Entities pursuant to the Cash Collateral Stipulations.

The Plan stipulates payment of these amounts, less the sum of the adequate protection payments (collectively defined "Full Payment"), as soon as practicable after the Effective Date.

Notably, from the time of Plan Confirmation until the Purchase Price proceeds are distributed, claimants of the Debtor (including the Waikiki Entities) would be enjoined from enforcing any lien or encumbrance against the Debtor, the Debtor's Estate(s), or its property. In addition, claimants would also be enjoined from recouping against any debt, liability, or obligation due from the Debtor, the "Subsequent Filing Entities" (i.e., NewCo and FF&E Subsidiary), the Azabu Liquidating Trust or the Debtor's Estate or apparently from enforcing

---

[11] The Plan stipulates that the Waikiki Entities will continue to receive adequate protection payments until the Waikiki Entities receive full payment of the Claims, accrued interest and attorney fees discussed above.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed  05/04/07  Page 17 of 42

remedies of any kind.  In addition, the Claimants, including the Waikiki Entities are enjoined from participating in the Japanese bankruptcy proceedings and only are permitted to file a claim and vote their claims as unsecured creditors, and file pleadings in support of the Plan with the Azabu Liquidating Trust participating as the only secured creditor.  The penalties for violating these provisions are sanctions and potential equitable subordination of claims.

**F.**     **Bases for Opinion: Appropriate Rate of Interest**

In 2004, a plurality of the United States Supreme Court ruled that the formula approach is the proper method to determine the appropriate interest rate to apply to a cram down loan in a chapter 13 payment plan *(In re Till).*[12]  The formula approach provides that a creditor receiving deferred payments under a plan of reorganization must be paid a rate of interest equal to a base rate plus a premium for the risk of non-payment associated with future payment.

In applying the formula approach, the Supreme Court held that bankruptcy courts should start with the national prime rate and apply an adjustment for the risk of non-payment as appropriate.  The amount of the risk adjustment will depend on factors such as "...the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."  In applying these factors, the Court makes frequent reference to the need for an objective rather than subjective approach.  It concludes that Congress intended "...an approach that is familiar in the financial community..." and one that ensures that "...the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default..."  While *Till* stops short of concluding the amount of the risk adjustment, the Supreme Court notes that courts "have generally approved 1-3 percent" as the proper risk adjustment over the prime rate.  (*Id.* at 1954)

---

[12] *Till v. SCS Credit Corp.*, 541 U.S. 465,124 S. Ct. 1951 (2004).

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 18 of 42

Courts in the Ninth Circuit have a long history of having applied the formula approach to determine the interest payable on deferred payment obligations under a plan of reorganization. (See *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1508 (9th Cir. 1987); *In re Fowler,* 903 F.2d at 697-98 (9th Cir. 1990); *In re Boulders on the River, Inc.,* 164 B.R. 99, 105 (9th Cir. BAP 1994)). However, in many of the cases published subsequent to *Till,* courts throughout the country[13] have paid considerable attention to *Till's* Footnote 14 which indicated that in Chapter 11 (in contrast to Chapter 13), "it might make sense to ask what rate an efficient market would produce." 124 S. Ct. at 1959 n.14. In *In re Prussia Assocs.* 322 B.R. 572 (Bankr. E.D. Pa. 2005), the bankruptcy court concluded that in most Chapter 11 cases, the *Till* formula approach "will probably make sense" but that it was required to determine if a market rate was more appropriate. In *In re: American Homepatient, Inc.,* 420 F.3d 559, the Sixth Circuit Court of Appeals also took its cue from Footnote 14 and concluded that "the market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality."

### Application of Till

In applying this approach to derive the appropriate rate of interest for the Claims, I considered the Supreme Court's instruction (and other courts' findings subsequent to *Till*) that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce."

Accordingly, I began my analysis, by considering customary rates that real estate lenders will charge for a loan secured by a hotel of similar size and quality. I supplemented my

---

[13] However, at least one bankruptcy court concluded that it was not bound by *Till* since it was only a four-justice plurality. *In re Cook,* 322 B.R. 336 (Bankr. N.D. Ohio).

[ 18 ]

industry knowledge by reviewing market research performed by third parties and also independently surveyed lenders who routinely lend on or arrange loans on similar hotel properties. Based on my industry knowledge and research results, the current customary rate for a floating rate loan secured by a fee interest in a high quality hotel would have the following characteristics:[14]

- Loan-to-value ratio ("LTV Ratio)[15] of 65% to 80%; averaging about 75%
- Debt coverage ratio ("DSCR")[16] typically ranging from about 1.20 to 1.35
- Interest rate of LIBOR plus 95 to 250 basis points; averaging about 150 to 160 basis points. [17] [18]

The rates quoted above are for loans where properties are held in fee and not in situations involving loans secured by properties subject to ground leases, as is the case with the Hotel. Lenders typically require a risk premium for making a loan secured by properties subject to ground leases as the payment obligation to the ground lessor typically is senior to the obligation to the lender. Based upon my survey and industry experience, an additional 20 to 30

---

[14]  In addition, lenders typically charge "points" or origination fees in connection with new financings. A typical origination fee is approximately 1% of the loan amount ($3.3 million of the Waikiki Entities' Claims). I have been conservative and have not included any adjustments for loan fees.

[15]  The LTV ratio expresses as a percentage the relationship between the value of the collateral and the debt. A loan-to-value ratio of 100% indicates a loan that equals the value of the collateral. A percentage of less than 100% indicates that the market value of the collateral exceeds the outstanding loan amount.

[16]  While the LTV ratio indicates the relative risk to the lender of ultimate repayment of principal, the DSCR describes the amount by which the current income from a property exceeds the required loan payments, and thus the relative assurance that the lender will continue to receive monthly debt service payments. A DSCR value of 1.00 would indicate that the property has exactly enough income to satisfy the interest obligations of the loan.

[17]  Lenders also quote fixed rate loans, based on comparable duration U.S. Treasuries (i.e., 5, 7 or 10 years). However, a floating rate loan is appropriate in the instant case given that 1) the Plan does not have a fixed or definitive effective date; 2) the proposed interest rate on the Waikiki Entities' Claims under this Plan is based on a floating rate; and 3) the *Till* decision is based on a floating rate (the prime rate).

[18]  Market participants with whom I spoke indicate potential for widening spreads on hotel loans due to fallout from the subprime mortgage market and possible negative affects on commercial real estate financing markets.

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1051   Filed 05/04/07   Page 20 of 42

basis points likely would be required.  This results in an interest rate of approximately 170 to 190 basis points over LIBOR on a floating rate loan or 7.06% to 7.26% currently.[19]

However, the indicated range reflects market interest rates for real estate loans *with customary security instruments (i.e., first mortgages, assignments of rents, UCC financing statements, etc.) and enforceable rights and remedies,* which loans bear almost no relationship to what is proposed in the Plan.  The Waikiki Entities' liens are being stripped and replaced with liens of uncertain priority and diminished rights to pursue remedies.  No lender will make a loan with the rate and structure proposed by the Joint Plan Proponents, nor is there a readily discernible market for the type of "loans" proposed by the Plan.

Consequently, I have applied the formula approach set forth in *Till* to determine the interest rate required to compensate the Waikiki Entities for the substantial incremental risk associated with payments on the Claims pursuant to the Plan.  According to *Till,* bankruptcy courts should start with the national prime rate and apply an adjustment for the risk of non-payment as appropriate.[20]  The amount of the risk adjustment will depend on factors such as circumstances of the estate, nature of the security, feasibility and duration.  In addition, I

---

[19]  The Debtor currently is paying the Waikiki Entities adequate protection payments equal to LIBOR plus 175 basis points (7.11%), which is consistent with the current market for a hotel loan secured by property subject to a ground lease, meeting customary LTV and DSCR requirements and possessing customary security interests, rights and remedies.

[20]  Real estate loans customarily are quoted as a spread over a risk-free rate, such as LIBOR or U.S. Treasuries. Although the prime rate is the rate charged by U.S. banks to their most credit worthy customers, it is not a risk-free rate like LIBOR or U.S. Treasuries, and it is not typically the basis upon which real estate loans are quoted.  The prime rate, currently 8.25% is running about 290 basis points above LIBOR and about 360 basis points above 10-year treasuries.  (As indicated above, a typical spread for a customary loan secured by a mortgage on a high quality hotel and subject to a ground lease, would range from approximately 170 to 190 basis points over LIBOR or about 7.06% to 7.26% currently.)  Thus, to determine the appropriate risk-adjusted rate per Till, I considered what additional risk premium (if any) above the amount customarily borne by lenders to prime-based borrowers was necessary to compensate the Waikiki Entities' for the particular risk factors associated with this Property and the proposed Plan.  In order to facilitate comparisons to customary real estate loans, I also have indicated the spread over LIBOR that results in a rate that is equal to my concluded prime-based rate.

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1051   Filed 05/04/07   Page 21 of 42

checked the reasonableness of my concluded rate per *Till* against objective market indicators, as implied by interest rates and returns typically required on real estate investments with varying risk profiles, and in so doing was able to evaluate if my concluded rate is consistent with what an efficient market would suggest.

Based on the particular risk factors associated with this Property (including the elimination of existing liens on the Hotel, FF&E and Lock Box, virtual elimination of rights to enforce remedies customarily afforded creditors, and risks associated with the successful completion of numerous complex transactions, including a foreign bankruptcy proceeding, and consideration of the Debtor's ability to meet debt service payments in the event the Plan is not consummated), *the proper risk-adjusted rate of interest on the Claims is at least 11.25% or 300 basis points over the current prime rate of 8.25%, and arguably, higher*. This adjusted rate of 11.25% is equal to about 590 basis points over LIBOR and about 400 to 420 basis points over the typical rate for a ground-leased hotel loan meeting customary underwriting criteria. The bases for my conclusion are discussed in the following paragraphs, beginning with a discussion of the four factors enumerated by the Supreme Court that are to be considered in determining the proper risk adjustment.

Characteristics of the Estate

To evaluate this factor, I considered the ownership and management of the Debtor's primary asset (the Hotel) as of today until such time that the Waikiki Entities receive Full Payment. Under the Plan, the Debtor will own the Hotel until the Domestication Transaction occurs. Concurrently therewith, Newco receives a transfer of the Debtor's assets. Hyatt will continue to manage the Hotel as it has been doing since 1976 when it opened. In addition, since Hyatt is the Court-approved buyer of the Hotel, it has a vested interest in continuing to successfully manage the Hotel until such time that it takes ownership.

[ 21 ]

I have assumed, based on these factors, that the Debtor and management are qualified and incentivized to manage the Hotel profitably, and so have not added a risk adjustment factor for characteristics of the Estate. However, the identity of the Trustee for the Azabu Liquidating Trust ("Liquidating Trustee") has yet to be identified. Should further information come to my attention in this regard, an adjustment for this risk factor may be warranted.

<u>Nature of the Security</u>

Lenders consider the risks of repayment in pricing their loans, and particularly, the nature of their collateral and their rights to that collateral should they need to resort to it to satisfy debts owed by obligors. Thus, in evaluating this factor, I have considered the collateral for the Waikiki Entities both as it exists today, and as proposed under the Plan.

I first have considered the value of collateral as currently held by the Waikiki Entities, relative to the Claims, or loan-to-value ratio. As noted, a customary loan-to-value ratio for a loan secured by high quality hotel property of this type typically would not exceed approximately 75% to 80%.

I have used Hyatt's $445 million Purchase Price as an estimate for the fair market value of the Hotel (inclusive of the FF&E), which currently serves as primary collateral for the Waikiki Entities' Claims. [21] In addition to the Hotel, the Waikiki Entities have a security interest in the Lock Box which includes funds estimated to total $47.6 million, in which the Waikiki Entities have a first priority interest in at least $30 million (subject to priority disputes with other

_____

[21] The Hyatt bid was for equity interest in both the Hotel and King's Village. The Waikiki Entities currently do not have a security interest in King's Village, and therefore the $445 million overstates the value of the Waikiki Entities' collateral. I do not have information as to how much of Hyatt's bid is allocable to King's Village and thus my analysis of the LTV is advantageous to the Debtor (i.e., the LTV ratio would be higher, and the loan relatively more risky, if the Purchase Price was adjusted to exclude King's Village).

[ 22 ]

creditors). Based on these assumptions, the LTV ratio on the Waikiki Entities' Claims appear to meet customary underwriting criteria for loans secured by high quality hotel properties.

However, *the Plan materially and permanently changes the nature of the Waikiki Entities' existing security interests and rights.* As a result, the Plan imposes substantial risk to the Waikiki Entities that is incremental to the risk of typical real estate loans meeting customary LTV requirements.

The Plan substantially changes the Waikiki Entities' security interests by stripping the Waikiki Entities of their direct liens against specific and tangible cash and real property, and replaces them with liens against newly formed securities (i.e., FF&E Subsidiary Note, Common Stock of FF&E Subsidiary, Plan Note) and liens on other entities' liens on undifferentiated pools of assets (i.e., FF&E Subsidiary Note Collateral, Plan Note Collateral and "Azabu Trust Assets"), against which certain other claimant classes also have secured claims. The treatment under the Plan fundamentally changes the nature of the Lender's security in the Estate, raising numerous issues and uncertainties, as discussed below.

A primary benefit to the Waikiki Entities of having first and second priority liens on real property is that the remedies in the event of default (*i.e.*, foreclosure on real property) are clearly defined. The Plan substitutes these readily enforceable rights secured by liens on real property with liens on debt and/or equity securities, and liens on other entities' liens on note collateral. The Plan does not address how the Waikiki Entities would go about enforcing their claims in the event of default by obligors or diminution in collateral value, and would appear to explicitly bar them from doing so based on the injunctions set forth in the Plan.

Even if I ignore the apparent restriction on enforcement of the Waikiki Entities' rights in the event of default, it is unclear what procedure the Claimants would follow to pursue recoveries. Since the value of the FF&E Note and the Plan Note (or "Notes," collectively) is

[ 23 ]

comprised entirely of the underlying collateral value, it is unclear, based on my reading of the Plan and discussions with Counsel, whether the Waikiki Entities have to first enforce their rights against the Notes, or if they would be able to pursue their claims against the underlying collateral directly. It is also unclear whether any of the other claimants holding liens against the Notes would be required to also seek an enforcement of their rights at such time, or if legal action could be pursued by the Waikiki Entities on a unilateral basis. In addition, if legal action were to be taken to liquidate the Notes' collateral in satisfaction of claims, it's unclear if the assets could be selectively sold (and if so, at which claimant's choosing), or if all the assets comprising the Notes' collateral would have to be liquidated. Finally, while the Plan states that these replacement liens will attach to the Plan Note and Plan Note Collateral to the same extent, validity and priority as the Waikiki Entities' liens on the Hotel, FF&E and Lock Box, it's not clear if the Waikiki Entities ultimately maintain first and second priority recovery rights against these assets since other secured claimants would be provided liens on the same collateral (e.g., on the Plan Note, Azabu Liquidating Trust's lien on Plan Note Collateral, Azabu Trust's Assets, etc.).[22]

In addition, the rights of the Waikiki Entities are materially lessened under the Plan with respect to the international proceedings. During the Japanese Case, the Azabu Liquidating Trust will be the only holder of a secured claim since the Plan Note is issued in favor of the Trust, and the Trust holds the lien on the Plan Note. Despite having secured claim status in the U.S. Bankruptcy Court proceedings, the Waikiki Entities would be relegated to unsecured creditors in the Japanese Case. Moreover, the Plan enjoins them from actively participating in

---

[22] Also, consider the potential for mechanics' liens being filed against the Hotel in connection with potential capital improvements. Will the Waikiki Entities' Claims be senior to any subsequent mechanics' liens filed directly on the Property? These and other types of subordination risks are among the possible risks the Waikiki Entities' face based on the treatment of their Claims.

[ 24 ]

U.S. Bankruptcy Court - Hawaii  #05-50011   Dkt # 1051   Filed 05/04/07   Page 25 of 42

these proceedings, only permitting them to file and vote their claims as unsecured creditors and file pleadings in support of the Japanese Plan. While the Plan permits the Waikiki Entities (and other claimants) to seek relief from the U.S. Court with respect to this prohibition, it only allows this remedy in the event that the claimants can prove that (1) the Japanese Plan provides for treatment of the claims in a manner that is inconsistent with the Plan or (2) an action is filed in Japanese Case seeking relief with respect to liens on the Lock Box that would be detrimental to the rights of the various parties asserting interests in the Lock Box, including the Waikiki Entities. In either event, it is only after the fact of potentially irreversible harm being inflicted that the claimants are allowed to even approach this Court for permission to participate in the Japanese Case. As a result of these specific prohibitions on participation and subordination from secured to unsecured creditor, the Waikiki Entities will effectively have little or no say in the outcome of the Japanese case.

In summary, the Plan replaces the Waikiki Entities' liens on specific real property with liens against intangible and undifferentiated collateral, having uncertain recovery positions and ill-defined, if any, mechanism for recovery or foreclosure in the event of default or collateral value diminution. It also extinguishes rights they otherwise would have as secured creditors in connection with the Japanese Case. These provisions permanently and grossly diminish the existing rights of the Waikiki Entities, rights that creditors holding secured interests in U.S. real property are customarily afforded. Accordingly, the Waikiki Entities must be compensated for the attendant incremental risk they bear if they are to receive the present value of their Claims. A *minimum* risk adjustment of 200 basis points above the prime rate is merited in connection with adjusting for the nature of the security, and arguably, considerably more is required, in order to compensate the Waikiki Entities for the substantial additional risk imposed by the Plan with respect to this risk factor.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed  05/04/07  Page 26 of 42

Feasibility

As it is used in connection with the Bankruptcy Code, feasibility means the likelihood that a plan will not result in the need for further reorganization or liquidation. Courts must determine whether a plan will generate cash flow sufficient to meet payment obligations and/or that events anticipated to occur after confirmation of a plan of reorganization are more likely than not to occur within time frames anticipated.

In evaluating the feasibility factor, I also took into account outcomes upon which the implementation and consummation of the Plan depends. The Plan is contingent upon the successful and timely completion of numerous and complex milestones and transactions, subject to Court approval, including (in summary): creation of NewCo and the FF&E Subsidiary, the bankruptcy filings of related entities, the sale of the FF&E subsidiary, U.S. Bankruptcy Court Plan Confirmation, creation of the Azabu Liquidating Trust, creation of the Plan Note and Plan Note Collateral, release and transfer of all then existing liens against the Debtor's assets to the Plan Note and Liquidating Trust's Lien on the Plan Note Collateral, Japanese Court Plan Confirmation, the completion of the Domestication Transaction, the completion of the sale of NewCo to Hyatt, and the payment of claims from the Purchase Price proceeds. [23]

---

[23] The Plan explicitly sets forth eight conditions precedent ("Conditions Precedent") for the Plan to be completed, although any of these can be waived by the Debtor and the Committee in their sole and absolute discretion. The Conditions Precedent include:

1. The Confirmation Order shall have been entered on the docket of the Bankruptcy Court for at least ten days
2. The Plan Supplement shall be in form and substance reasonably satisfactory to the Debtor, the Committee and the Buyer
3. The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor, the Committee and the Buyer
4. The FF&E Order shall have been entered in a form and substance reasonably satisfactory to the Debtor, the Committee and the Buyer
5. The FF&E Sale shall have occurred
6. The Japanese Case shall have commenced
7. The Japanese Confirmation Order shall have been issued
8. The Debtor shall be dissolved pursuant to the Japanese Plan and the Japanese Confirmation Order

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 27 of 42

At least of three of these steps (the Japanese Plan Confirmation, the Domestication Transaction and the sale of NewCo to Hyatt) depend on parties other than the Debtor and this Court, are far from certain in their outcomes, and accordingly, increase the risks that the Plan is not feasible. In particular, based on deposition testimony from the Debtor's Japanese bankruptcy expert, Mr. Matsushita, and conversations with Counsel, I understand that the Japanese Case, upon which the Plan's success is highly dependant, could take a considerable amount of time to conclude with no assurances that the desired result will be achieved. Also, failure by the Debtor to obtain a private letter ruling from the Internal Revenue Service that the Domestication qualifies as a reorganization under U.S. Code § 368(a)(1)(F) could have significant economic consequences with respect to distributions under the Plan, among other impacts.

The particular risk and consequences of Hyatt not closing should be considered. The Acquisition Agreement sets forth numerous conditions that must be met or waived in order for Hyatt to close the Equity Sale, the proceeds from which will fund payment of claims. Among other conditions, Hyatt requires entry of a confirmation order pursuant to a judicial corporate reorganization proceeding under Japanese law (or order authorizing liquidation by the trustee appointed in the Japanese Case) and requires a private letter ruling in connection with the Domestication transaction. Further, based on a recent amendment to the Acquisition Agreement, Hyatt also requires fulfillment of most of the Conditions Precedent by particular dates. If these or other conditions are not met and Hyatt backs out, the Joint Plan Proponents may be unable to solicit bids similar in value to that made by Hyatt. The lack of even a single competing bidder to Hyatt's stalking horse bid of $445 million suggests that the Debtor would face the very real

U.S. Bankruptcy Court - Hawaii #05-50011 Dkt # 1051 Filed 05/04/07 Page 28 of 42

prospect of either having to sell NewCo (or the Hotel itself) for a lower price some time in the future or fundamentally changing the proposed Plan.[24]

I also have considered the extent to which the Hotel generates cash flow sufficient to service debt service in accordance with the terms set forth in the Plan. While the Plan provides for all accrued and outstanding interest to be paid from the proceeds of the Equity Sale, the ability of the Hotel to service debt prior to the Equity Sale and also in the event Hyatt does not close must be considered.

Financial markets customarily use measures such as debt service coverage ratios and ratios based on cash flow proxies such as Net Operating Income ("NOI") or EBITDA (earnings before interest, taxes, depreciation and amortization) to determine whether an enterprise is likely to produce sufficient cash flow to meet debt service payments. A loan with a higher debt service coverage ratio is relatively less risky than a loan where the cushion between cash flow and debt service is smaller. As previously indicated, lenders today would customarily require a minimum DSCR of about 1.25 to 1.35 for loans on hotel properties similar to the Property.

I determined the extent to which the Property is likely to generate sufficient cash flow meet debt service obligations under the Plan. I calculated a DSCR based on a pro forma estimate of the 2007 NOI from the Hotel, the only source of funds available to service the interest on the Claims (other than a sale of the Hotel). Because the Hotel's future performance is uncertain, I first considered the possibility that, at a minimum, the Hotel would achieve the same

---

[24] I estimate the potential decline in operating income attributable to increases in ground lease rent and required sinking fund payments to cover demolition costs upon expiration of the ground lease in 2047 to be at least 3.3 million based on adjustments to the Debtor's cash flows as previously discussed. At a at capitalization rate of 6.3%, quoted by Jones LaSalle in its "Hotel Investors Sentiment Survey" in December 2006, this expense increase represents more than a $48 million loss in value. Hyatt made its stalking horse bid of $445 million prior to the outcome of certain of the ground lease negotiations. Hyatt presumably considered that the ground leases would increase by some amount in making its offer. However, it is not clear what price a subsequent buyer would offer in view of the substantial increase in the ground lease-related expenses.

[ 28 ]

level of profitability in 2007 as it did in 2006.[25]  I then adjusted the 2006 NOI downward to account for estimated increases in ground rents and sinking fund expenses[26] currently being negotiated by the Debtor pursuant to provisions of existing ground leases, and included an estimate for bankruptcy-related expenses that would be paid in 2007.[27]  This results in an adjusted NOI of $17.5 million to $19.5 million (depending on assumptions for increases in ground rent).  I performed a similar analysis using the Debtor's most recent monthly budget for 2007, which results in an adjusted NOI of $20.6 million to $22.6 million.[28]  Finally, I calculated debt service on the Waikiki Entities' Claims of $330 million, at 5.86% as proposed in the Plan, which is equal to $19.6 million per year.  (See Appendix for adjusted cash flows under various scenarios of ground rent expense increases.)

Based on pro forma estimates of 2006 operating results, the DSCR is equal to 0.89 to just less than 1.0, indicating that cash flow from operations of the hotel is insufficient to cover debt service.  Based on the Debtor's forecast for 2007, as adjusted, the DSCR would be

---

[25] Based on actual results per the Debtor's year-to-date financial statements for 2006.

[26] I understand that the Debtor's Revised 2007 Hotel Budget incorporates the recently negotiated ground lease agreements for the parcels owned by 2424 Kalakaua Associates, but does not include any increases for the CK and Okumoto parcels, which currently are being negotiated, or provisions for annual sinking fund expense for demolition of the Hotel when the leases expire in 2047.  I calculated a pro forma ground lease expense for 2007 by adding to the 2006 ground rent expense the difference in ground rent in 2006 and that forecast by the Debtor for 2007 plus additional expenses for estimated increases in ground rent for the CK and Okumoto parcels and the annual sinking fund.

[27] Bankruptcy-related expenses reflect are based on restructuring and professional expenses shown in the Debtor's Monthly Operating Reports, plus an additional monthly amount of $50,000 to cover the Debtor's other ordinary operating expenses, management fees of Azabu U.S.A. and the Debtor's Japan operating expenses, as provided for in the Fourth Cash Collateral Stipulation.  On an annualized basis, these expenses total $6.4 million.  This amount does not include federal, state or local taxes, or US Trustee fees, nor does it include any provision for expenses associated with the Azabu Liquidating Trustee, as defined by the Plan, or expenses associated with the Japanese Case or bankruptcy proceedings of related Debtor entities.

[28] To calculate 2007 NOI based on the Debtor's forecast, I added estimated ground rent increases for the CK and Okumoto parcels to the Debtor's 2007 ground rent estimate, plus a provision for the annual sinking fund and bankruptcy-related expenses.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 30 of 42

1.05 to 1.15, which is below the low end of the customary required range for similar loans, suggesting some risk that enough income would be generated from the Hotel to service interest at the non-default contract rate proposed under the Plan. An additional $1 million to $3 million would be required in cash in from a source external to the Debtor in order to satisfy customary debt coverage requirements based on my adjustment of the Debtor's 2007 forecast.[29]

I have added a risk adjustment of *at least* 100 basis points to account for the feasibility risk of this Plan. This adjustment is for the inherent risks associated with successfully completing the steps required to pay the Claims of Waikiki Entities in full and takes into account that the risk that the Hotel may be unable to generate sufficient cash flow to meet debt service obligations under the Plan, with debt service calculated based on the non-default contract rate (LIBOR plus 50 basis points or 5.86%).

Duration

The Joint Plan Proponents expect the transactions contemplated under the Plan, including Full Payment of the Waikiki Entities' Claims, to be completed by December 31, 2007. I have not made a further adjustment to the prime rate based on duration, since I have considered the inherent risks associated with the timing and successful completion of the Plan by including an adjustment for feasibility, above.

Summary

The Plan imposes substantial risks to the Waikiki Entities beyond the lending risks normally borne by lenders to "prime" borrowers. An upward adjustment to the prime rate of at least 200 basis points is merited to compensate the Waikiki Entities for Plan provisions which grossly diminish the value of the Waikiki Entities' security interests and customary rights

---

[29] The most recent 2007 forecast provided by the Debtor shows net operating income of $3.8 million below that shown in the forecast attached to the Fourth Cash Collateral Stipulation submitted to this Court as recently as April 20, 2007 and only about $1 million better than the 2006 results.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 31 of 42

as creditors, including the stripping of its liens, apparent prohibitions on enforcement of remedies in the event of default or collateral value diminution, restrictions on participating in the Japanese Case and subordination of its secured claim to unsecured status in the Japanese proceedings. In addition, I have concluded that an upward adjustment of at least 100 basis points to the prime rate is merited to compensate for the multiple risks associated with the successful and timely implementation of the Debtor's Plan, as well as risk associated with the Debtor's ability to make debt service payments. I conclude that a minimum of 300 basis points must be added to the current prime rate of 8.25%, for a total risk-adjusted rate of at least 11.25% or about 590 points over the risk-free rate (LIBOR) and 400 to 420 over the rate for traditional hotel loans subject to ground leases which meet customary underwriting criteria.

*Market Rate and Test*

I have looked to the market for an objective indication of the reasonableness of the risk premium I added to the prime rate in applying the formula approach set forth in *Till* and as a means of evaluating what a potential market rate of interest for the Waikiki Entities' Claims would be. To supplement my experience in these matters, I or my staff reviewed national surveys of lenders and investors involved in hotel transactions and financings, interviewed active market participants, and also searched for any evidence currently in the record that might provide additional market data points useful in reaching an opinion.

Specifically, I considered the return demanded by lenders and investors for hotel investments with varying risk attributes to provide some guidance as to the proper risk adjustment given the specific attributes of the Plan. Although none of these indicators is directly analogous -- there is no efficient market where one can obtain ready quotes on a security of the type proposed for the Waikiki Entities' Claims under the Plan -- they do provide some market parameters for determining the appropriate interest rate. The benchmarks I considered included:

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 32 of 42

1. Interest rates on hotel mezzanine debt

2. Typical leveraged returns demanded by hotel equity investors

3. Typical unleveraged returns demanded by hotel investors

4. Indicators from the bankruptcy proceedings of this case including (i) the default rate set forth in the Loan Agreements between the Debtor and the Waikiki Entities and (ii) the interest rate negotiated for accrued, unpaid ground rent for certain ground leases on the Hotel

The first benchmark is the customary rate charged by lenders providing mezzanine financing on hotels. Mezzanine debt would be junior to the primary or "first" mortgage on the property and therefore is riskier. Accordingly, it provides some measure of incremental return required above the customary rate on senior debt for additional risk. Based upon my experience and interviews with participants active in real estate lending, the interest rate demanded by mezzanine lenders on a similar property (before consideration of the ground lease) would range from LIBOR plus 400 basis points (or approximately 9.36% based upon today's three-month LIBOR of 5.36%) to about 15%, averaging somewhat above 11%.

Second, I considered the unleveraged rate of return sought by investors in hotel properties. This rate of return, or discount rate, reflects yields demanded for ownership of the entire capital structure, assuming that the property is held "free and clear" of any debt. By definition, it reflects the weighted average return required by investors in the less risky portion of the capital structure usually associated with "debt" (i.e., the first 65% to 80% of value or so) and the more risky portion associated with equity (the last 35% to 20%). The most recent *Korpacz Real Estate Investor Survey*, a widely recognized and authoritative publication on real estate investment returns for various property types, indicates an average unleveraged IRR or discount

rate for full-service lodging properties of 11.26%.[30] Since the unleveraged IRR or discount rate (also known as the weighted average cost of capital) reflects something of a hybrid between debt and equity risk, it arguably provides a potential benchmark for evaluating the proper rate on the Waikiki Entities Claim, which has risks beyond those customarily associated with real estate secured debt.

The third benchmark is the required yield for equity investments in hotels. I reviewed the results from a recent survey from Jones Lang LaSalle Hotels. This survey indicated that the average leveraged equity return sought by investors in hotel properties located throughout the Americas, but principally in the U.S., is 17.3% and 16.2% for hotel properties located in the Hawaii.[31] This yield reflects the return required by equity investors assuming that they have customary levels of debt on the property. This leveraged equity yield is higher than the unleveraged yield since debt obligations must be satisfied before equity receives a return.

Lastly, I reviewed the record of the Azabu proceedings to determine if there were data points that might be useful in establishing a range for an appropriate interest rate under the Plan. I first considered the Loan Agreements between the Waikiki Entities and the Debtor. These loans provide for a default rate equal to the higher of LIBOR plus 400 basis points or 14.0%. The Debtor would have been in default under the terms of the Loans had it not been for the relief provided by the automatic stay due to the bankruptcy filing, since the Loans were set to mature in November 2006.

I also considered the recent settlement agreement between 2424 Kalakaua Associates and the Debtor with respect to certain ground leases for the Hotel. The terms of the agreement provide for an adjustment of the ground lease payment to market as of January 1, 2007. The agreement calls for any unpaid amounts to accrue during the renegotiation process

---

[30] *Korpacz Real Estate Investor Survey*, First Quarter 2007

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed  05/04/07  Page 34 of 42

and be paid in a lump sum, along with interest accrued at an annual rate of 10.0%. The proposed settlement is based, in part, on the input provided by The Hallstrom Group, a real estate valuation consultant, engaged by the Debtor to provide assistance with the negotiation. The Debtor's Ground Lease Settlement Motion includes a declaration by James E. Hallstrom, Jr., of the Hallstrom Group, indicating that the terms of the new minimum and percentage rents are fair and reasonable.

The market indicators discussed above and summarized in the table following, range from 10% to 16% and suggest that an appropriate risk adjustment might fall someplace in between. Since the Waikiki Entities Claims still represent debt, the appropriate interest rate, arguably, should be lower than a leveraged equity return (the 16% benchmark), but higher than the interest rate accruing on a ground lease payment (of 10%), which is senior to all other debt on the Hotel. The average return on hotel properties of 11.26% reported in the *Korpacz Investor Survey* is indicative of returns on hotel investments with a blend of debt and equity risk characteristics, and thus serves as a useful benchmark for my analysis. However, even this rate might be too low as an indicator of risk since certain characteristics of the Plan impose risks that debt and equity investors do not typically bear (i.e., prohibitions on enforcing remedies in the event of default or collateral value diminution or being precluded from participating in a foreign bankruptcy proceeding).

---

[31] Jones Lang LaSalle Hotels, *Hotel Investor Sentiment Survey*, December 2006.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 35 of 42

| | Source | Index and Spread | Current Interest Rate [1] / Required Return |
|---|---|---|---|
| 1. | Lender Surveys - Mezzanine Debt | LIBOR + 400 basis points to 15.00% | 9.36% - 15.00% |
| 2. | Korpacz Real Estate Investor Survey [2] | N/A | 9.25%- 14.00% Average - 11.26% |
| 3. | Jones Lang LaSalle Hotels: Hotel Investor Sentiment Survey [3] | N/A | 17.30% - Americas 16.20% - Hawaii |
| 4. | Waikiki Entities Amended & Restated Loan Agreements: Default Rate | Higher of LIBOR + 400 basis points or 14.00% | 14.00% |
| 5. | Ground Lease Settlement: 2424 Kalakaua Associates & Debtor | N/A | 10.00% |

[1] Based upon a three-month LIBOR of 5.36% as of April 26, 2007
[2] Unleveraged Discount Rate (IRR)
[3] Average Leveraged IRR

These market indicators suggest that an interest rate of prime plus *at least* 300 basis points or 11.25% or about 590 basis points over LIBOR, is reasonable, based on application of the *Till* formula approach. In my view, this rate also reflects *a minimum return* that the market likely would demand for a "loan" with the same risk characteristics as those imposed by the Plan on the Waikiki Entities' Claims.

G.    **Plan Feasibility Using Appropriate Risk-Adjusted Interest Rate**

Based on an appropriate interest rate of at least 11.25%, the Hotel generates insufficient cash flow to cover debt service. Annual debt service at a rate of 11.25% is $37.6 million on the Waikiki Entities' Claims. However, based on the analysis I previously described, the pro forma 2006 cash flow is only $17.5 million to $19.5 million and the 2007 cash flow is only $20.6 million to $22.6 million, still well below the required debt service payment at the appropriate rate. The resulting DSCR is 0.46 to 0.52 based upon adjusted 2006 results, and 0.55 to 0.60 based upon the adjusted 2007 budgeted amounts.

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed  05/04/07  Page 36 of 42

**H.**     **Declaration of Mr. Stephen J. Pearlman**

I have read the Pearlman Declaration and have the following observations and

opinions:

1.     Mr. Pearlman concludes that "the spreads today for high quality,
moderately leveraged hotel financings would range between 140 - 170 bps
on a floating rate financing and 100 - 125 bps on a fixed rate financing."[32]
*Quite remarkably, Mr. Pearlman does not address the material additional*
*risks that are specific to the Plan's treatment of the Waikiki Entities'*
*Claims.*  The market interest rates cited by Mr. Pearlman are based upon
traditional loans secured by interests in real property, with customary
security instruments, rights and remedies.  These traditional loans depart
markedly from the Waikiki Entities' Claims under the treatment proposed
in the Plan.  Mr Pearlman indicates he "looked at" the Plan[33] (although not
prior to executing his declaration), but apparently he did not consider it in
reaching his conclusions.  In particular, he fails to consider the risks
associated with elimination of the Waikiki Entities' liens on the Hotel,
FF&E and Lock Box, prohibitions on rights to enforce remedies and fully

---

[32]  Pearlman Declaration, p. 9. Mr. Pearlman quotes rates for both floating rate and fixed rate loans. He states that the typical loan term for a floating rate loan is 3 to 5 years and for a fixed rate loan is 5, 7 and 10 years, yet the "term" over which interest on the Waikiki Entities' Claims is to be calculated is for a period of only a little more than two years. Pearlman states that a floating rate loan is more appropriate when the property is being held for a shorter period of time (Pearlman Deposition Transcript, p.41).

[33]  Pearlman Deposition Transcript, pp. 16-17

U.S. Bankruptcy Court - Hawaii  #05-50011   Dkt # 1051   Filed  05/04/07   Page 37 of 42

participate in the Japanese Case, risks associated with the successful completion of the Plan. Because Mr. Pearlman does not take these substantial risks into account, his concluded rates do not provide the Waikiki Entities' the present value of their Claims nor do they bear any reasonable relationship to a market rate. Furthermore, in not accounting for these additional risks, he effectively ignores the instruction of the U.S. Supreme Court in *Till*, a case with which Mr. Pearlman says he is not familiar.[34]

2.   Mr. Pearlman's concluded spreads on floating rate hotel loans are higher than what the Plan proposes (Mr. Pearlman cites a typical range for a floating rate loan of LIBOR plus 140 to 170 basis points, while the Plan proposes LIBOR plus 50 basis points). The non-default contract rate proposed under the Plan is *lower* than the rates Mr. Pearlman concludes are today's market rates for floating rate financing for similar properties, thereby suggesting that higher rates for the Waikiki Entities' Claims are warranted even before taking into account the additional risks associated with the Plan's treatment of the Waikiki Entities' Claims.

3.   In my opinion, the indicated rates for floating rate loans on hotels meeting customary underwriting criteria concluded by Mr. Pearlman merit upward adjustment in order to account for the additional risks associated with ground leases. Mr. Pearlman acknowledges that interest rates for loans on properties subject to ground leases would be higher, but indicates that his

---

[34]Pearlman Deposition Transcript, p. 11

U.S. Bankruptcy Court - Hawaii  #05-50011   Dkt # 1051   Filed 05/04/07   Page 38 of 42

quoted range takes this into account.[35]  However, neither Mr. Pearlman's declaration nor handwritten notes of interviews with lending sources (which were produced at his deposition), make mention that the interest rates quoted are for properties owned in fee as well as for ground leased properties, nor do they indicate any difference in the interest rate that would be charged.

4.      Mr. Pearlman says he assumed a 75% to 80% loan-to-value ratio based on the value attributed to the Hyatt Corporation bid but never indicates in his declaration that he adjusted the value to exclude King's Village, which is not collateral for the Waikiki Entities' Claims.  His declaration also states that he assumed a first class hotel with positive cash flow.  However, he did not consider increases in ground rent for the CK or Okumoto parcels, the sinking fund, any increases related to labor costs pursuant to an agreement reached in late 2006 or ongoing costs of the bankruptcy.[36]

---------------------------------- // \\ ----------------------------------

I reserve the right to update or modify this Report for additional information that may come to my attention, including information that was unavailable as of the date of this Report.

Executed this ____4th____ day of May 2007 at Los Angeles, California.

By:    Cynthia Nelson

---

[35]Pearlman Deposition Transcript, pp. 29-30, 42

[36]Pearlman Deposition Transcript, pp. 22-23, 40, 61.  Mr. Pearlman also admits that he only considered increases in the Steiner ground leases after he executed his Declaration on April 16, 2007 (Pearlman Declaration, p. 17).

[ 38 ]

## II.   EXPERT QUALIFICATIONS

Cynthia Nelson is a Senior Managing Director in FTI's Corporate Finance practice in Los Angeles. Ms. Nelson assists stakeholders in evaluating, developing and implementing turnaround plans and restructurings in both judicial and non-judicial circumstances. She has assisted companies, lenders, creditors' committees and debtors in analyzing and developing plans of reorganization, analyzing financing options and market rates of interest, evaluating asset dispositions, conducting due diligence in connection with acquisitions and financing and providing testimony in adversarial proceedings.

Ms. Nelson has had extensive experience in a wide variety of industries including real estate, hospitality, entertainment, manufacturing and health care. She has particular expertise in advising stakeholders in troubled companies that are strategically dependent on real estate. She has extensive "hands-on" industry experience assisting owners and secured lenders in formulating and implementing asset management, development, financing and disposition strategies.

Prior to its acquisition by FTI, Ms. Nelson was a Partner at PricewaterhouseCoopers in its Business Recovery Services practice. Prior to that, she was a Senior Associate in Investment services at Jones Lang Wootton USA and an Associate at Laventhol & Horwath. She began her career at the Valencia Company as a Development Assistant.

Ms. Nelson regularly gives speeches and presentations at conferences, seminars and forums. She has published articles in *CPA Expert, DBR Viewpoint, ABI Journal and Turnaround Management.*

Ms. Nelson is Certified Insolvency and Restructuring Advisor (CIRA). She is a member of the Association of Insolvency and Restructuring Advisors (AIRA), American Bankruptcy Institute (ABI) and Commercial Real Estate Women. She is Director on the Board of the Los Angeles Bankruptcy Forum and a member of the Advisory Board of the Center for Sustainable Cities at the University of Southern California.

Ms. Nelson holds a M.B.A. and a Master of Planning from the University of Southern California and a B.S. in Urban Planning from California State Polytechnic University.

FTI will be compensated for this analysis and testimony based upon its hourly billing rates multiplied by the hours incurred by the professionals assigned to this engagement. Ms. Nelson's billing rate is $630 per hour.

### Articles and Publications

"2005 Bankruptcy Code Amendments: The "Real" Story", *CPA Expert*, Fall 2005, Cynthia Nelson and Michael Linsk

"Are Film Exhibitors Heading for a Sequel?", *Daily Bankruptcy Review – Small Cap*, August 10, 2005, Cynthia Nelson

'UnTill We Meet Again: Why the Till Decision Might Not Be the Last Word on Cramdown Interest Rates", *American Bankruptcy Institute Journal*, December/January 2005, Ronald F. Greenspan and Cynthia Nelson

"Now Playing at Theatres Everywhere: The Prisoners Dilemma - How the Bankruptcy Process is Saving the Motion Picture Exhibitor Industry and One Company in Particular", *Turnaround Management*, Spring 2002, M. Freddie Reiss, Cynthia Nelson and John Yozzo

U.S. Bankruptcy Court - Hawaii  #05-50011   Dkt # 1051   Filed  05/04/07   Page 40 of 42

**Cynthia Nelson**
**Expert Witness Engagements Which Involved Deposition and/or Testimony**


*Kemper Investors Life Insurance Company, et al. v. Bellevue Hotel Associates, et al.*
Illinois Chancery Court, Lake County, 1998
Deposition on behalf defendant, Bellevue Hotel Associates, et al., in connection with amounts due under cash flow mortgages secured by commercial properties and nine hotels

*In re: John Marion Brewster and Karen Ann Brewster*
United States Bankruptcy Court, Central District of California, 1999
Declaration testimony on behalf of creditor regarding market rate of interest on claim secured by real property

*In re: BRB #1 Partners*
United States Bankruptcy Court, Central District of California, 2000
Deposition on behalf of junior lien holder in connection with market rate of interest and default interest on participating mortgage secured by healthcare facility

*In re: Edwards Theatres Circuit, Inc., et al.*
United States Bankruptcy Court, Central District of California, 2001, 2002
Declaration testimony on behalf of Debtor in connection with lease rejection and consequential damages claimed by Orix Snyder

*In re: Edwards Theatres Circuit, Inc., et al.*
United States Bankruptcy Court, Central District of California, 2001, 2002
Declaration testimony on behalf of Debtor in connection with damages claimed by PLC Commercial, LLC, et al. pertaining to termination of joint venture agreement and lease

*Del Rosa Plaza Associates, LLC v. George Krikorian*
Superior Court of the State of California, Los Angeles County, 2002
Deposition testimony on behalf of guarantor of lease obligation with respect to damages associated with successor lessee's rejection of lease in bankruptcy proceeding

*In re: Stephanie-Cardona, LLC*
United States Bankruptcy Court, District of Nevada, 2003
Declaration and deposition testimony on behalf of secured lender in connection with plan feasibility and market rate of interest on lender's claim secured by shopping center

*LASVN#2 et al. v. Van Ness & Sperry, Inc. et al*
Superior Court of the State of California, Los Angeles County
Trial testimony on behalf of defendant in connection with market discounts to minority interests in real estate limited liability corporations and partnerships

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1051  Filed 05/04/07  Page 41 of 42

**Cynthia Nelson**
**Expert Witness Engagements Which Involved Deposition and/or Testimony**
**(continued)**


*In re: Mayore Estates, LLC; 80 Lafayette Associates, LLC*
United States Bankruptcy Court, Southern District of New York, 2003
Declaration testimony on behalf of secured lender in connection with plan feasibility and
market rate of interest on lender's claim secured by office property in New York City


*In re: Transcontinental Majestic Corporation*
United States Bankruptcy Court, Northern District of Texas, Dallas Division, 2004
Expert report and deposition testimony on behalf of secured lender in connection with
plan feasibility and market rate of interest on lender's claim secured by hotel in San
Francisco, CA


*In re: Art Four Hickory Corporation*
United States Bankruptcy Court, Northern District of Texas, Dallas Division, 2004
Expert report and deposition testimony on behalf of secured lender in connection with
plan feasibility and market rate of interest on lender's claim secured by office property in
Dallas County, TX


*Grenhill Investment Corporation v. Tekelec*
Superior Court of the State of California, Los Angeles County, 2006
Deposition and trial testimony in connection with damages resulting from alleged breach
of real property lease for a building located in Thousand Oaks, CA

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1051   Filed 05/04/07   Page 42 of 42