WAGNER CHOI & EVERS
Attorneys at Law
JAMES A. WAGNER
CHUCK C. CHOI
JAMES F. EVERS
NEIL J. VERBRUGGE
Topa Financial Center, Fort St. Twr.
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
Email: wcelaw@wcelaw.com

Attorneys for Debtor and Debtor-in-Possession
AZABU BUILDINGS COMPANY, LTD.

STUTMAN, TREISTER & GLATT P.C.
JEFFREY C. KRAUSE, *admitted pro hac vice*
ERIC D. WINSTON, *admitted pro hac vice*
H. ALEXANDER FISCH, *admitted pro hac vice*
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email: jkrause@stutman.com; ewinston@stutman.com;
    afisch@stutman.com

Co-counsel for the Official Committee of Unsecured Creditors

WATANABE, ING & KOMEIJI, LLP
WAYNE K. MAU
First Hawaiian Center, Suite 2300
999 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 544-8339
Facsimile: (808) 544-8399
Email: wmau@wik.com

Co-counsel for the Official Committee of Unsecured Creditors

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| In re | ) | BK. NO. 05-50011 |
| --- | --- | --- |
| | ) | (Chapter 11) |
| AZABU BUILDINGS COMPANY, LTD., a.k.a. AZABU TATEMONO K.K., | ) ) ) | **HEARING** |
| | ) | Date: June 12, 2007 |
| | ) | Time: 9:30 a.m. |
| Debtor and Debtor-in-Possession. | ) ) ) ) ) | Judge: Hon. Robert J. Faris |

## DECLARATION OF STEPHEN J. PEARLMAN RE: SUBMISSION OF REBUTTAL EXPERT REPORT

I, Stephen J. Pearlman, declare as follows:

1. I am over the age of eighteen years and would testify competently and based on my own personal knowledge to the matters set forth in this declaration.

2. This Declaration is submitted in support of the "Debtor's And Official Committee Of Unsecured Creditor's First Amended Joint Chapter 11 Plan Of Reorganization For Azabu Buildings Company, Ltd., A.K.A. Azabu Tatemono K.K., And Subsequent Filing Entities, Dated As Of March 16, 2007, As Amended."

3. Attached hereto as Exhibit "A" is a true and correct copy of my Rebuttal Expert Report submitted in response to the Expert Report of Cynthia Nelson, filed May 4, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15, 2007 at New York, New York.

/s/ Stephen J. Pearlman
Stephen J. Pearlman

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1094   Filed 05/15/07   Page 3 of 7

# Rebuttal Expert Report of Stephen J. Pearlman

I have prepared this statement to expand and clarify my Declaration dated April 11, 2007 and my Deposition taken on May 2, 2007, as well as to respond to the Expert Report dated May 4, 2007, submitted by Cynthia Nelson.

The underlying premise of my Declaration was to provide clear market data to show the current rates of interest being charged for hotel loans secured by quality four-star hotel properties with good cash flow numbers. The three criteria I used to support these pricing comparisons to the Hyatt Regency at Waikiki were 1) Leverage, 2) Debt Service Coverage Rates ("DSCR"), and 3) the use of a Base Rate as either LIBOR or Treasury Rate. The following are several documents that I did not have access to at the time of both my original Declaration and subsequent Deposition and which I have subsequently reviewed.

1. Joint Plan dated April 23, 2007
2. Revised 2007 Budget
3. Expert Report of Cynthia Nelson dated May 4, 2007 with attachments
4. Debtor-in-Possession's Monthly Operating Report for the month of March 2007.

It is my purpose to provide clarity to the analytical approach that has been presented and to provide a methodology to the understanding of what is truly a market rate interest for a Property of this quality and performance.

There were certain major points of variance which I will focus on and bring into my opinion as to how they really impact on the applicable interest rate being contemplated here.

1. What is a market rate of interest?
2. Plan feasibility including the value of the hotel or the loan to value ("LTV") as well as its cash flow projections in respect to DSCR.
3. Security Interest in the hotel collateral.

1. <u>Market Rate of Interest</u>
The mandate shaping my original Declaration was to provide information about current market rate of interest for loans to properties in the same category as the subject hotel. Under the existing Waikiki Entities Loan Agreements, the Base Rate is defined as "three month LIBOR plus 50 basis points" or 5.85% as if May 14, 2007. LIBOR was 5.35%, therefore the Base Rate was 5.85%. There is no background material regarding the assumptions on which the original credit spread was based and no statement in the original loan documents as to the value of LIBOR at the commencement of the loan. I have never assumed this to be the rate of interest for the Loan today. Today's rates, as I have demonstrated from five (5) different financial institutions (Lender's Survey,) are based on 140-170 basis point spread over one month/three month LIBOR. There is very little difference in the one or three month LIBOR Rate. I want to point out in Cynthia Nelson's Report that suggests that the

Base Rate should be Prime Rate. The Prime Rate is not a market or competitive interest rate. The Prime Rate is set by Banks with no attention to the money and capital markets' interest rate indices. The Prime Rate at 8.25% today is 290 basis points higher than LIBOR and 350 to 355 basis points higher than Term Treasury Rate. So for any rate analysis, the Prime Rate, certainly cannot be considered a "risk-free" market rate of interest. Whereas LIBOR is truly a money-market rate, with financial institutions bidding for deposits which they, in turn, use as the basis for LIBOR. Treasury Rates are the pure risk-free rates as they reflect the obligations of the U.S. Government. Therefore, even to suggest the use of Prime Rate would increase the spread immediately without any regard for risk. Basically, the Prime Rate is an artificial rate and has no basis to underwriting risk in a loan. Ms. Nelson's use of Prime Rate was flawed in the following respect in that to compare a loan with prime to a LIBOR based pricing, she is assessing additional spread to her pricing by as much as 290 basis points over the market reference rate. Therefore, her rate is overstated if you take into account a fully underwritten loan.

2. Plan Feasibility

Although I was not asked to comment on the plan when I made my Declaration (I actually only received a copy of it to prepare for this response), statements regarding risks associated with the Plan made by Cynthia Nelson in her Report are addressed herein. As I understand, the Court will decide on the feasibility of the Plan. The important elements of risk mitigation are the underlying value of the Hotel and its ability to generate sufficient cash flow to meet the required Debt Service Coverage Ratio ("DSCR"). Below I provide a revised calculation for LTV and DSCR. Both calculations are slightly different from my Declaration due to my access to more current information. In both calculations, the ratios still support my criteria for a quality Hotel asset.

A. Loan to Value

I calculated my assumed LTV based on Hyatt Corporation's offer to purchase the hotel at $444,500,000 and their "hard deposit" of $44,500,000 to support that purchase. Hyatt's "stalking horse" bid was affirmed when that bid was taken out to the market.

| | |
|---|---:|
| Hyatt's Bid Price: | $444,500,000 |
| Less: | |
| Estimated Value of King's Village Shopping Center | $8,000,000 |
| Net Price on Hotel | $436,500,000 |
| Waikiki Entities Loan Balances | $330,000,000 |
| Loan to Value | 75.6% |

As shown above, I deducted the estimated value of the Kings Village Shopping Center, using a derived value of $8,000,000. The valuation was based on the direct capitalization method of the Property's net operating income by a capitalization rate

2

of 6% to 7%. The value above is the median value. The remaining value after this deduction is sufficient to provide a LTV of 75.6%. This LTV fits well within the range that I was provided in the Lender Survey of 75-80%.

B. <u>Debt Service Coverage Ratio:</u>
The DSCR below is a revision of the DSCR set forth in my original Declaration based on additional information contained in the after-acquired revised 2007 Budget. The new calculation includes an adjustment for ground lease rent. As before, my revised DSCR does not contain a deduction for bankruptcy costs. As I understand it, bankruptcy costs do not have a priority over a Lender's interest or principal payments. The following is my calculation of the minimum DSCR based on the revised 2007 Operating Budget which takes into consideration the impact of the increase in labor costs due to a recent union agreement. Also, I have reflected a deduction for the demolition reserve (sinking fund) that has been mentioned. Finally, I have adjusted the ground lease payments to reflect an increase to the CK and Okumoto leases. I reviewed certain calculations to assume a conservative ground rent. Based on the Steiner negotiated lease payment, I assumed a conservative lease number which includes an increase in the CK and Okumoto leases as well. The following are my current and updated calculations for the assumed DSCR of the Hyatt Regency. It is important to point out that Azabu has cash balances in their accounts of at least $10,000,000 which provides additional cushion to the coverage.

### 2007 Revised Budget

| | |
|---|---:|
| AGOP: | $44,070,539 |
| Less: | |
| Hyatt Management Fees (both) | $5,783,563 |
| Projected Ground Rent for all Parcels And Demolition Reserve | <u>$10,000,000</u> |
| Adjusted NOI—2007 | $28,286,976 |
| Debt Coverage Ratio Rate—7.05% (LIBOR + 1.70%) | <u>$23,265,000</u> |
| | 1.22X |

Based on my Lender's Survey, the indicated DSCR fall within the acceptable range of 1.2x to 1.25x.

3. <u>Security Interest</u>
Waikiki Entities' security interest is well laid out in the Amended Plan. As the Plan puts forth, the secured creditors will continue to have a beneficial interest in the Liquidating Trust, and security interest in the Trust assets. If warranted, the Trust can

3

pursue the collateral if there are any issues. The fact that there is a bona fide contract from Hyatt Corporation for $444,500,000 should give creditability that the Hotel can be sold at that price or even at a reduced price but sufficient enough to repay Waikiki Entities' loan of $330,000,000. The fact that the FF & E is being put into a separate subsidiary for whatever reason, does not change the fact that the secured lenders have a beneficial interest in those assets as well. I would use an analogy pertaining to CMBS securities. To create CMBS securities, mortgage loans of varying dollar amounts, property types and locations with different terms and conditions are pooled and transferred to a Trust. Bonds then are issued backed by the pool of assets held in the Trust. There are also single asset securitizations which are structured the same way. It is my view that from the structure presented under the Plan, the Waikiki Entities continue to have the economic benefit in the collateral.

Based on my comments above, I render my expert opinion that the current interest rate environment and specifically floating rate financing would underwrite the Hyatt Regency Waikiki at a spread range of 140-170 basis points over LIBOR or 6.75% to 7.05% today. Overall returns for an investment property given its quality, location and (with Hyatt) its sponsorship would attract extremely aggressive pricing such as 6% to 7% capitalization rate. The corresponding range of value on a direct capitalization basis would then be $404,000,000 to $471,000,000. Overall from an underwriting perspective, the value of the hotel and its cash flow supports the ability that the existing lenders to be repaid their loans in full.

At this point, I want to comment on that the capital markets having recently experienced some reaction to the subprime residential issue and the general concerns of the Rating Agencies over underwriting in general. This reaction has translated into credit spreads on fixed rate loans widening by 20-25 basis points. This spread widening has not been seen in floating rate debt facilities and certainly not where the underlying collateral has low LTV and well performing high quality cash flow.

Also in Ms. Nelson's Report, on pages 31 to 34, she mentions several rate comparisons including mezzanine loan rates and equity returns for hotel investors. As to mezzanine loans these loans are paid a premium reflecting their risk exposure at being 80-90% of the capital stack. In regard to equity returns, the suggested rate of return is purely an equity return and not a debt return on a low leverage and well performing asset. In trying to bring these rates to bear, the underlying hotel asset, with low loan to value and a well cash flowing asset continues to support the type of pricing at 140-170 basis point over LIBOR.

4