WAGNER CHOI & EVERS
JAMES A. WAGNER
CHUCK C. CHOI
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
Email: wcelaw@wcelaw.com

Attorneys for AZABU BUILDINGS COMPANY, LTD.

WATANABE ING & KOMEIJI, LLP
WAYNE K. MAU
First Hawaiian Center, Suite 2300
999 Bishop Street
Honolulu, Hawaii   96813
Telephone No.     (808) 544-8300
Telefacsimile No.  (808) 544-8399
Email: wmau@wik.com

STUTMAN, TREISTER & GLATT PC
JEFFREY C. KRAUSE       CA 94053
ERIC D. WINSTON         CA 202407
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone No.     (310) 228-5600
Telefacsimile No.  (310) 228-5788
Email: jkrause@stutman.com, ewinston@stutman.com

Attorneys for OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF HAWAII

In re

AZABU BUILDINGS COMPANY
LTD., aka AZABU TATEMONO
K.K.

           Debtor and
           Debtor-in-possession

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 05-50011
(Chapter 11)

**HEARING**

DATE:   June 14, 2007
TIME:   9:00 a.m.
JUDGE:  Honorable Robert J. Faris

Relates to Docket # 1316

## ORDER APPROVING JOINT MOTION FOR ORDER AUTHORIZING PLAN PROPONENTS TO ENTER INTO GLOBAL COMPROMISE WITH THE CHUO MITSUI TRUST & BANKING CO., LTD. AND THE WAIKIKI ENTITIES; EXHIBITS "A"-"B"

A hearing on the Joint Motion for Order Authorizing Plan Proponents to

Enter Into Global Settlement with The Chuo Mitsui Trust & Banking Co., Ltd. and

the Waikiki Entities (the "Motion) filed by Azabu Buildings Co., Ltd., aka Azabu

Tatemono K.K., the above-captioned debtor and debtor-in-possession (the

"Debtor"), and the Official Committee of Unsecured Creditors (the "Committee")

on June 14, 2007, was held on shortened notice at 9:00 a.m. on June 14, 2007, in

the Courtroom of the United States Bankruptcy Court for the District Court of

Hawaii, the Honorable Robert J. Faris presiding (the "Court").  Appearances are

noted in the record.  The Motion sought authority to enter into definitive settlement

agreements with The Chuo Mitsui Trust & Banking Co., Ltd. ("CMTB") and

Waikiki First Finance Corp., and Waikiki S.F. LLC (together, the "Waikiki

Entities"), based on the terms set forth in the binding term sheet filed with the

2

motion and counsel represented that the final settlement agreements would be submitted as exhibits to a proposed order.

The Court has reviewed the Motion and considered the objections thereto by Beecher Ltd. ("Beecher"), and Kabushiki Kaisya Pacifica. The Motion seeks to settle the Estate's claims against CMTB and the Waikiki Entities, including without limitation the claims set forth in Adversary Proceeding No. 07-90008, in which the Plan Proponents, as joint plaintiffs, sought, *inter alia*, to avoid the liens and interests asserted by CMTB and the Waikiki Entities or equitably subordinate the claims of CMTB and the Waikiki Entities, and preserve their liens and interests for the benefit of the estate pursuant to Bankruptcy Code §§ 510(c) & 551.

This Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the Motion was proper and sufficient under the circumstances for the reasons stated in open Court, (d) the final Settlements (as defined below) attached hereto are consistent with the terms described in the term sheet, and (e) good cause appearing, and for the reasons stated in open Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure,

IT IS HEREBY ORDERED that:

1.        The Motion is granted, and the Debtor and the Committee (together, the "Plan Proponents") are authorized to enter into the CMTB Global Settlement Agreement with CMTB and the Waikiki Entities Global Settlement

Agreement with Waikiki Entities, in the forms attached hereto as Exhibits "A" and "B," respectively (the "Settlement" or "Settlements").

2.      The Plan Proponents are authorized to perform the acts contemplated in the Settlements, including modifying the order confirming the Second Amended Joint Chapter 11 Plan of Reorganization for the Debtor and Subsequent Filing Entities Dated as of April 23, 2007 (the "Plan"), to reflect the terms of the Settlements.

3.      The provisions of the Settlements shall supersede the provisions of the Plan and supplement, except to the extent as it expressly modifies, the Plan Settlement Agreement between the Plan Proponents and the Waikiki Entities, which was approved pursuant to an Order entered herein on June 26, 2007. *PJN*

4.      The approval of the Settlements and the entry of this Order shall not and does not constitute a determination of any marshalling rights that Beecher or the estate of the Debtor may have with regard to the collateral of the Waikiki Entities because the obligation of the Waikiki Entities to obtain payment first from the collateral in which Beecher asserts a junior lien will not apply if applicable law or Bankruptcy Court order otherwise requires.

5.      The approval of the Settlements shall result in the Waikiki Entities' secured claim numbers 25 and 26 against the Debtor being Allowed in the full amount of $330 million, as provided in the Settlements, and such Allowed secured claims shall be unassailable and not contingent on any further

determination under applicable law or by the Court regarding recovery or marshalling rights of any other party in interest, including, but not limited to Beecher. For purposes of clarity, the allowance and payment of the Waikiki Entities' secured claims as provided under the Settlements is without prejudice to any ~~rights, liens, and interests evidenced by Beecher's secured claim or garnishment claim or related to Beecher's secured claim or garnishment claim, at law or in equity, including Beecher's right to compel marshaling as well as other~~ *RF* rights, claims, liens or interests of all parties (and objections thereto) that were preserved in the Beecher Plan Settlement with the Debtor and Committee approved by this Court on June 8, 2007 and as incorporated into the Plan and Confirmation Order.

6.     On the Effective Date of this Agreement, the Debtor and Committee shall dismiss with prejudice the Adversary Proceeding pending against CMTB and the Waikiki Entities. Furthermore, the Committee and the Debtor shall not seek to equitably subordinate any claim of CMTB, the Waikiki Entities, or any third party based on any act or omissions of CMTB or the Waikiki Entities or any person or entity affiliated with CMTB, provided, however, that the Debtor and Committee may pursue equitable subordination of any claims of other claimants based on the acts or omissions of those claimants.

JUL 1 1 2007

_____

**United States Bankruptcy Judge**

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1379  Filed 07/11/07  Page 5 of 30

## CMTB GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement (this "Agreement") is entered into as of the 14th day of June 2007, by and among Azabu Buildings Company, Ltd., a.k.a. Azabu Tatemono K.K. chapter 11 debtor-in-possession, and its affiliates and subsidiaries (the "Debtor"), and The Official Committee of Unsecured Creditors ("Committee"), on the one hand, and The Chuo Mitsui Trust and Banking Co., Ltd. ("CMTB"), on the other hand, (each a "Party" and collectively, the "Parties"):

### RECITALS

A.     The Debtor's involuntary chapter 11 petition was filed on November 10, 2005 (the "Petition Date") in the United States Bankruptcy Court, District of Hawaii, commencing Case Number 05-50011 (the "Bankruptcy Case"). On February 1, 2006, the Debtor consented to the entry of an order for relief and such order was entered. Since then, the Debtor has acted as a debtor in possession, exercising the rights and powers of a trustee in the Bankruptcy Case pursuant to section 1107 of Title 11 of the United States Code (the "Bankruptcy Code").

B.     Prior to the commencement of the Bankruptcy Case, pursuant to the terms of the Basic Agreement, the Debtor established two depository accounts at CMTB's Tokyo branch, a Lock Box Account No. 8424791017S-1 and a Renovation Reserve Account No. 8424791025S-1. The Lock Box Account and the Renovation Reserve Account are hereinafter referred to collectively as the "Deposit Accounts."

C.     From time to time, after the establishment of the Deposit Accounts, numerous CD's were issued using funds from the Deposit Accounts and pledged to the Waikiki Entities. On April 19, 2002, the Debtor pledged deposits in the amount of $13,400,000 from the Lock Box Account and $4,560,000 from the Renovation Reserve Account in favor of the Waikiki Entities, to which CMTB consented, and which were perfected the same day with a fixed date (*kakutei hizuke*). On or about April 26, 2002, Beecher, Ltd. ("Beecher") garnished the Deposit Accounts delivering a Garnishment Order to CMTB on April 30, 2002.

D.     Following the Beecher garnishment, CMTB reported to the Tokyo District Court on May 8, 2002, that as of April 30, 2002 (the date Beecher delivered the garnishment order to CMTB), the following Debtor deposits existed in addition to the CDs pledged to the Waikiki Entities: (i) Foreign currency regular savings deposit: Balance US $298,931.68; (ii) Foreign currency regular savings deposit: Balance US $8,996.54; (iii) Foreign currency regular savings deposit: Balance US $514.04; and (iv) Regular savings deposit: Balance Yen 92,720,565.

E.     After the Beecher garnishment, the Debtor continued to make deposits into the Deposit Accounts. These subsequent deposits were not subject to Beecher's garnishment. From time to time, utilizing funds deposited in the Deposit Accounts after Beecher's garnishment, additional CDs were issued and pledged to the Waikiki Entities. On July 20, 2004, the Debtor pledged deposits in the amount of $10,000,000 from the Lock Box Account and $1,100,000 from the Renovation Reserve Account in favor of the Waikiki Entities, to which CMTB consented, and which were perfected the same day with a fixed date (*kakutei hizuke*), bringing the total amount subject to the Waikiki Entities' pledge to $29,060,000 ("Pledged CD Funds"). On

## EXHIBIT A

August 9, 2004, the Resolution and Collection Corporation ("RCC") garnished the additional funds in the Deposit Accounts delivering a Garnishment Order to CMTB on August 10, 2004.

F.     Following the RCC garnishment, CMTB reported to the Tokyo District Court on August 19, 2004, that as of August 10, 2004 (the date the RCC delivered the garnishment order on CMTB), the following Debtor deposits existed in addition to the CDs pledged to the Waikiki Entities: (i) Foreign currency regular savings deposit: Balance US $2,008,251.35; (ii) Foreign currency regular savings deposit: Balance US $45,592.97; (iii) Foreign currency regular savings deposit: Balance US $298,931.68; and (iv) Foreign currency regular saving deposit: Balance US $8,996.54 (the "Garnished Unpledged Funds").

G.     After the RCC garnishment, the Debtor continued to make deposits into the Deposit Accounts. These subsequent deposits were not subject to the garnishments in favor of Beecher and the RCC (the "Additional Deposit Amount"), but were subject to various claims of the Waikiki Entities and CMTB's asserted setoff rights.

H.     CMTB asserts a claim against the Debtor, proof of which was timely filed on May 31, 2006 in the amount of $198,892,048.85 (Claim # 15), of which $72,608,109.72 is allegedly secured by (i) setoff rights asserted against the Deposit Accounts, and (ii) the pledged stock of Azabu U.S.A. Corporation ("Azabu U.S.A."), the Debtor's wholly owned subsidiary (and affiliated debtor). CMTB also asserts a contract claim against Azabu U.S.A. in its related chapter 11 case.

I.     On February 22, 2007, the Debtor and Committee filed objections to CMTB's claim and counterclaims (collectively, the "Defenses and Counterclaims") (which commenced Adversary Proceeding Case Number 07-90008), alleging, *inter alia*, that CMTB's claim should be equitably subordinated and avoided (the "Adversary Proceeding"). Waikiki First Finance Corp. and Waikiki S.F. LLC (collectively, the "Waikiki Entities") were also named as defendants in the Adversary Proceeding. On April 27, 2007, CMTB filed a timely Answer to the Defenses and Counterclaims denying liability therefor and asserting affirmative defenses thereto.

J.     The Debtor and Committee (the "Plan Proponents") have filed their Joint Chapter 11 Plan Of Reorganization (the "Plan") and Disclosure Statement (the "Disclosure Statement"), as amended, which, among other things, contemplates (through a series of related transactions) (1) a transfer of the furniture and other personal property ("FF&E") used at the Hyatt Regency Waikiki Resort and Spa (the "Hotel") to a subsidiary of the Debtor (the "FF&E Subsidiary"), (2) a transfer of all of the Debtor's assets, including the Hotel, to a successor of the Debtor ("NewCo") under a tax free "F Reorganization", and (3) a termination of the equity interests of the existing shareholders in NewCo and issuance of new stock in NewCo to Hyatt in exchange for a payment of $444.5 million in cash and reduction in its administrative priority claims of $500,000. On March 22, 2007, after conducting a hearing on the adequacy of information contained in the Disclosure Statement, this Court approved an amended version of the Disclosure Statement for solicitation. CMTB, which holds Class 2 and Class 9 claims against the Debtor, voted its provisional ballots to reject the Plan and filed objections to Plan confirmation, and pleadings in support of such objections (including expert reports).

2

K.      On March 26, 2007, the Debtor filed its motion (the "FF&E Sale Motion") for order authorizing the formation of subsequent filing entities and approving related transactions. CMTB, among others, opposed the FF&E Sale Motion and said motion was heard on May 21, 2007. The Bankruptcy Court authorized the Debtor to form the FF&E Subsidiary and NewCo and to file voluntary chapter 11 petitions for them, but deferred ruling on the portion of the FF&E Sale Motion that requested authority to transfer the FF&E to the FF&E Subsidiary free and clear of liens to June 14, 2007, concurrently with the Plan confirmation hearing.

L.      On April 13, 2007, CMTB filed its motion (the "Lift Stay Motion") for relief from the automatic stay with respect to the Deposit Accounts and the stock pledge of Azabu U.S.A. The Debtor and Committee opposed CMTB's Lift Stay Motion and the hearing thereon, which was originally heard on April 24, 2007, was continued to June 14, 2007, concurrently with the Plan confirmation hearing. The hearing on Plan confirmation commenced June 12, 2007, and concluded on June 14, 2007.

M.      The Parties have been in negotiations to settle their various disputes regarding Plan confirmation and the Adversary Proceeding. In furtherance of the mutual goal of resolving such disputes without further time-consuming and costly litigation, while simultaneously maximizing the benefit of the Debtor's estate, the Parties believe it to be in their respective best interests to fully and finally resolve their disagreements respecting Plan confirmation and the Adversary Proceeding. Accordingly, on June 13, 2007 the Parties entered into a binding term sheet (the "Term Sheet") that contained the operative terms of a global settlement. The Debtor and Committee filed (on shortened notice) a joint motion for Court approval of the Term Sheet, which was granted by the Bankruptcy Court at a hearing on June 14, 2007, over the objection of Beecher and Kabushiki Kaisya Pacifica. This Agreement, which is expressly required by the Term Sheet, and the final Waikiki Entities' Global Settlement Agreement" shall both be appended to the order approving the Term Sheet/global settlement (the "Settlement Order") when lodged.

N.      Therefore, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree that the following definitive Agreement fairly and accurately memorializes the global settlement embodied in the Term Sheet between the Parties, as follows:

## AGREEMENT

1.      <u>CMTB Shall Assign Its Claims Against The Debtor To The Debtor's Estate</u>. On the Effective Date (defined herein) of this Agreement, CMTB shall assign, as-is and without any representation or warranty, all of its claims against the Debtor and affiliated debtors, including without limitation Azabu U.S.A., and all rights, liens and interests relating thereto, including, but not limited to, CMTB's right of setoff against the funds in the Deposit Accounts, to the Debtor's estate. To effectuate this assignment, on the Effective Date of this Agreement, CMTB shall (x) release its pledge on the stock of Azabu U.S.A., (y) withdraw all claims filed against Azabu U.S.A. and the Debtor, and (z) deliver to Debtor (through its counsel) the Azabu U.S.A. stock certificate(s) now in CMTB's possession. For the avoidance of doubt, the foregoing claims assigned by CMTB to the Debtor's estate shall <u>not</u> be released by the operation of the Mutual General Release provisions of paragraph 8 below.

3

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1379   Filed 07/11/07   Page 8 of 30

2.     Settlement Payment By CMTB.  On the Effective Date of this Agreement, CMTB shall pay the Debtor's estate the sum of $7.5 million in full and final settlement of all Plan disputes, the Adversary Proceeding, the Defenses and Counterclaims, and all other claims which were or which could have been asserted by the Debtor and Committee therein against any of the persons and entities released under this Agreement.

3.     Transfer Of Deposit Accounts To Estate.  Unless prohibited from doing so under the Bankruptcy Code or bankruptcy, corporate rehabilitation or other Laws of Japan, and after receipt of notice reasonably satisfactory to Japan counsel for CMTB from the Waikiki Entities releasing their Pledges or consenting to the transfer or a final court order requiring the transfer, on the Effective Date, CMTB shall forward the Additional Deposit Amount, together with all accumulated interest thereon to an account of the Debtor or to the Liquidating Trust, if the Debtor requests that the transfer be made directly to the Azabu Liquidating Trust, identified in writing by the Debtor's counsel.  On the latter of a demand by the Debtor following (i) the entry of any final court order in Japan reasonably satisfactory to Japan counsel for CMTB which allows CMTB to transfer the Deposit Accounts funds, or (ii) the receipt by CMTB of written evidence reasonably satisfactory to Japan counsel for CMTB of the release by final court order of all then-existing garnishments on any funds in the Deposit Accounts, CMTB shall forward an amount equal to the current balance of the Garnished Unpledged Funds and the Pledged CD Funds to the Debtor to an account of Debtor or of the Azabu Liquidating Trust, if Debtor requests that the transfer be made directly to the Azabu Liquidating Trust, identified in writing by the Debtor's counsel.  Accumulated interest on the Additional Deposit Amount shall be paid at the time all funds in the applicable Deposit Accounts are paid and such Deposit Accounts are closed.  In the interim, CMTB will not withdraw any money from the Deposit Accounts.  The Parties further agree that CMTB shall continue to pay interest on the balance in the Deposit Account and shall be entitled to payment from funds in the Deposit Accounts for any normal and customary bank fees, charged to account holders, (a) to maintain the Deposit Accounts prior to transfer to the Debtor and (b) to transfer the funds to the Debtor (including, but not limited to, wire transfer fees, lifting fees, etc.) (subject to Bankruptcy Court approval, which the Parties agree to support).  Furthermore, the Debtor or of the Azabu Liquidating Trust shall be responsible for preparing and submitting any filings or reports to and/or for securing any approvals from any applicable governmental or regulatory body or agency necessary for CMTB to transfer the funds in the Deposit Accounts to the Debtor or of the Azabu Liquidating Trust.  After delivery of the funds in the Deposit Accounts funds pursuant to this Agreement to the Debtor or of the Azabu Liquidating Trust, the Debtor or of the Azabu Liquidating Trust will indemnify and defend CMTB against any liability to any other party claiming an interest in funds in the Deposit Accounts.  The Additional Deposit Amount, Garnished Unpledged Funds and the Pledged CD Funds transferred to the Debtor or to the Azabu Liquidating Trust shall be subject to the (a) Liens of the Waikiki Entities to the same extent they are presently subject to such Liens and to the terms of the Waikiki Entities' Global Settlement Agreement and the Plan Settlement Agreement, and (b) the setoff rights asserted by CMTB to the extent applicable.  Each transfer under this paragraph shall be in its current currency and without any conversion to any different currency.

4.     Dismissal Of Adversary Proceeding With Prejudice/Waiver Of Additional Equitable Subordination Actions.  On the Effective Date of this Agreement, the Debtor and Committee shall dismiss with prejudice the Adversary Proceeding pending against CMTB.

Furthermore, Committee and the Debtor agree not to seek to equitably subordinate any claim of CMTB or any third party based on any act or omissions of CMTB or the Waikiki Entities or any person or entity affiliated with CMTB; provided, however, that the Debtor and Committee may pursue equitable subordination of any claims of other claimants based on any acts or omissions of those claimants.

5. No Further Participation Required. On the Effective Date of this Agreement, nothing herein shall require, and no Party hereto shall seek to compel, CMTB to further participate (by providing witnesses, documents or otherwise) in the Debtor's chapter 11 case or any proceedings related thereto. Moreover, to the extent possible, the parties shall avoid any unnecessary public disclosure of this Agreement; provided, however, this Agreement shall be publicly filed as an exhibit to the Settlement Order. In no circumstances, will the Debtor or Committee endorse, support or encourage any efforts by any third party to join CMTB as a party to any future proceeding in the Bankruptcy Court or any other forum (by way of a third-party complaint, counter-claim, cross-claim or otherwise).

6. Binding Nature Of Agreement. If this Agreement is approved, it will become effective and permanent immediately and will not be contingent upon any future event, including, but not limited to, confirmation of the Plan or the Japanese plan; provided, however, that the Debtor and Committee waive any right to proceed with any plan of reorganization or liquidation that does not comply with the protections of CMTB hereunder; and provided further, this Agreement is, and will continue to be, binding on any successors or assigns, including any trustee (including a Chapter 7 trustee) appointed in the Debtor's Bankruptcy Case.

7. CMTB Will Support Plan Confirmation. CMTB will support confirmation of the modified Plan and entry of a confirmation order that implements this Agreement, and any Japanese plan that implements this Agreement, by withdrawing all objections to confirmation and all evidence, testimony and expert reports and objections filed in the Debtor's case; provided, however, that CMTB shall be allowed to fulfill its agreement with Beecher to share the use of expert witnesses who may still testify in opposition to confirmation for Beecher. CMTB agrees to take all reasonable and necessary or appropriate steps to support both the Plan and Japanese plan, as modified herein, so long as doing so does not entail any material expense to CMTB.

8. Mutual General Releases Between The Parties. On the Effective Date of this Agreement, and except with respect to any claims assigned to the Debtor's estate by CMTB under this Agreement:

(a) Release By Debtor And Committee. Except for the rights, duties, and obligations created by this Agreement, (i) the Debtor, on its own behalf in the Bankruptcy Case and (to the fullest extent allowed by law) on behalf of all of its affiliated debtors and debtors in possession in related bankruptcy cases, and their respective agents, predecessors, successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, jointly and severally, and (ii) Committee on its own behalf and (to the fullest extent allowed by law) on behalf of its members, constituents, all of the general unsecured creditors in the

417128v2

Bankruptcy Case and related bankruptcy cases, and their respective agents, predecessors, successors, assigns (including, but not limited to the Azabu Liquidating Trustee, the Disbursing Agent, and the Azabu Liquidating Trust Committee, each as defined in the Plan), past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, jointly and severally, hereby release and forever discharge CMTB and its agents, predecessors, corporate successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, jointly and severally, from any and all claims, demands, claims for relief, causes of action, debts, losses and liabilities of every type and nature whatsoever (including attorneys' fees and costs), from the beginning of time to the date of this Agreement, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, whether matured or unmatured, whether direct, indirect or consequential, whether legal or equitable, and whether asserted or unasserted, which will inure, directly or indirectly, to the benefit of the Debtor or its creditors including, but not limited to, those claims arising out of or related to: (i) the Adversary Proceeding; (ii) the Defenses and Counterclaims; (iii) any claims of equitable subordination; and (iv) any claims under Chapter 5 of the Bankruptcy Code that any of the Debtor or the related debtors' estates may have against CMTB and/or its affiliated entities and/or the Waikiki Entities and/or their respective affiliates (including, but not limited to, C.K. Corp.), and/or their respective agents.

(b) Release By CMTB. Except for the rights, duties, and obligations created by this Agreement, CMTB, on its own behalf and (to the fullest extent allowed by law) on behalf of all of its agents, predecessors, corporate successors, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, but expressly not on behalf of the Waikiki Entities or C.K. Corp., jointly and severally, hereby release and forever discharge the Debtor and its related debtors, including without limitation Azabu U.S.A., Committee, the members of Committee, and their respective agents, predecessors, successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns (including, but not limited to the Azabu Liquidating Trustee, the Disbursing Agent, and the Azabu Liquidating Trust Committee), jointly and severally, from any and all claims, demands, claims for relief, causes of action, debts, losses and liabilities of every type and nature whatsoever (including attorneys' fees and costs) from the beginning of time to the date of this Agreement, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, whether matured or unmatured, whether direct, indirect or consequential, whether legal or equitable, and whether asserted or unasserted, including, but not limited to, those claims arising out of or related to Claim No. 15, the Adversary Proceeding and the Defenses and Counterclaims. Nothing herein shall be deemed to limit or impair C.K. Corp.'s rights as lessee and/or sublessee and C.K. Corp. shall expressly retain all rights and claims arising from any lease or sublease agreement related in any way to the Debtor and its affiliates.

6

(c)    Acknowledgment And Waiver Of Bankruptcy Code § 502(j). The Parties hereby waive any and all rights they may have to seek reconsideration of the allowance or disallowance of any part of the Waikiki Entities' Allowed Secured Claims pursuant to Bankruptcy Code § 502(j) or otherwise.

9.    Effective Date/Best Efforts/Bankruptcy Court Approval. The "Effective Date" of this Agreement shall be the 20th day after the order approving this Agreement (the "Settlement Order") becomes final and non-appealable; provided, however, that the parties can (but are not obligated to) mutually waive the requirement of a final order and elect to close any time after entry of the Settlement Order. Provided further, however, the provisions of this Agreement that are not subject to the Effective Date shall be effective immediately upon entry of the Settlement Order. The Parties shall use their best efforts to achieve and accomplish the terms of this Agreement. The Parties agree that this Agreement is binding and final when executed (subject to Bankruptcy Court approval), and once finally approved shall not be modified in any way by the confirmation or denial of confirmation of the Plan or any subsequent plan, without the express written consent of the Parties. This Agreement is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019 and the Parties intend to obtain Bankruptcy Court approval hereof immediately. If this Agreement is not finally approved by the Bankruptcy Court for whatever reason, this Agreement shall be null and void and of no force or effect, and shall not be admissible against any Party hereto for any purpose.

10.    Voluntary Settlement. The Parties to this Agreement acknowledge and agree that each of them is entering into this Agreement freely and voluntarily and not acting under any misapprehension as to the effect hereof, and has acted and does hereby act freely and voluntarily and not under any coercion or duress.

11.    No Mistake of Fact or Law. In entering into this Agreement, each Party recognizes that no facts or representations are ever absolutely certain. Accordingly, each Party assumes the risk of any mistake, and if it should subsequently discover that any understanding of the facts or of the law was incorrect, each Party understands and expressly agrees that it shall not be entitled to set aside this Agreement by reason thereof, regardless of any mistake of fact or law.

12.    Mutual Representations and Warranties.

The Parties hereby represent and warrant to each other the following, each of which is a continuing representation and warranty:

(a)    Each of the Parties hereto, itself or its affiliates, is the sole and lawful owner of all right, title and interest in and to every asserted claim herein. None of the Parties or its affiliates have assigned or transferred, or purported to assign or transfer, to any person or entity any claims discussed herein. The Parties shall indemnify, defend, and hold each other harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, reasonable attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, with respect to any claims discussed herein.

7

(b)     This Agreement is a valid and binding obligation of the Parties, enforceable against each of them in accordance with its terms.

(c)     Except as otherwise expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for the Parties to carry out the provisions of this Agreement, and each of the Parties has obtained all necessary corporate and other approval to enter into and perform the obligations under this Agreement.  In addition, each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscribed at or above such person's signature.

(d)     Each of the Parties hereto has received independent legal advice from attorneys of its choice with respect to the advisability of making the agreements provided herein and with respect to the advisability of executing this Agreement, and prior to the execution of this Agreement by the Parties hereto, their attorneys reviewed this Agreement with them and have made all desired changes.

(e)     Except as otherwise expressly stated in this Agreement the Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation, or promise of the other party hereto or any other person in entering into this Agreement, except as expressly stated in this Agreement.  Each Party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(f)     The Parties hereto and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto, as they deem necessary.

13.     No Admission Against Interest.  Nothing contained in this Agreement or negotiations and communications leading up to it shall be construed as an admission against the interest of or an admission of fault or wrongdoing by any of the Parties hereto.  Except to enforce this Agreement, the terms of this Agreement, including, without limitation, the recitals and representations made by any Party shall have no force or effect and will not be binding upon, enforceable against, or deemed an admission or acknowledgment of any fact by any Party.  This Agreement shall not be admissible as evidence in any action or proceeding except to enforce this Agreement or to carry out the actions contemplated herein.

14.     Miscellaneous.

(a)     Except as provided herein, all covenants, warranties, representations, and indemnities made by the Parties to one another pursuant to this Agreement shall be and remain in full force and effect upon this Agreement becoming effective.

(b)     The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be appropriate or

8

reasonably necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occur before or after the date of this Agreement.

(c)     This Agreement is the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, whether oral or written, between the Parties hereto with respect thereto. In addition, this Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing, signed by the parties hereto.

(d)     This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Parties hereto.

(e)     The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

(f)     To the extent that performance is to be governed by time, time shall be deemed to be of the essence hereof.

(g)     This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Hawaii shall govern. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement; provided, however, that nothing herein shall restrict or deny to CMTB the benefit of any forum selection provision in any inter-creditor agreement(s) with respect to any future disputes between CMTB and any other creditor of the Debtor and the Debtor shall support CMTB (as Debtor deems appropriate in its discretion) in seeking to enforce such inter-creditor agreement(s).

(h)     This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same Agreement. This Agreement may also be executed by facsimile or electronic signature followed by delivery of the original executed Agreement.

(i)     This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

(j)     In the event that it becomes necessary for any party to this Agreement to take any action to interpret or enforce this Agreement, or any of its terms, and any Party thereafter incurs costs (including attorneys' fees) as a result thereof, the prevailing Party in such dispute shall be entitled, in addition to any judgment or award, to an award for all costs incurred (including reasonable attorneys' fees). The prevailing Party shall further be entitled to an award of reasonable attorneys' fees and related costs in connection with enforcement of any judgment, including enforcement following any appeal.

9

(k)    To the extent possible, the Parties shall avoid any unnecessary public disclosure of this Agreement, the fact that the Parties have entered into this settlement and any and all of the terms and conditions of this Agreement; provided, however, that this Agreement shall be publicly filed as an exhibit to the Settlement Order.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

417128v2

U.S. Bankruptcy Court - Hawaii  #05-50011  Dkt # 1379  Filed 07/11/07  Page 15 of 30

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

THE CHUO MITSUI TRUST AND BANKING CO. LTD.

By: _____
    Name:
    Title:

AZABU BUILDINGS COMPANY, LTD., A.K.A. AZABU TATEMONO K.K., CHAPTER 11 DEBTOR-IN-POSSESSION

By: _____
    Name:
    Title:

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: _____
    Name:
    Title:

**Approved As To Form & Content:**

Counsel For AZABU BUILDINGS COMPANY, LTD.

By _____
    Chuck C. Choi

Counsel For The
OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By _____
    Jeffrey C. Krause

Counsel For
THE CHUO MITSUI TRUST AND BANKING CO. LTD.

By _____
    Paul Alston

11

417128v2

## WAIKIKI ENTITIES' GLOBAL SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is entered into as of the 14th day of June 2007, by and among Azabu Buildings Company, Ltd., a.k.a. Azabu Tatemono K.K., chapter 11 debtor in possession ("Azabu"), and its affiliates and subsidiaries (together with Azabu, the "Debtors"), and the Official Committee of Unsecured Creditors (the "Committee"), on the one hand, and Waikiki First Finance Corp. and Waikiki S.F. LLC (together, the "Waikiki Entities"), on the other hand (each a "Party" and collectively, the "Parties"):

### RECITALS

A.    An involuntary chapter 11 petition was filed against Azabu on November 10, 2005 (the "Petition Date") in the United States Bankruptcy Court, District of Hawaii (the "Bankruptcy Court"), commencing Case Number 05-50011 (the "Bankruptcy Case"). On February 1, 2006, Azabu consented to the entry of an order for relief and such order was entered. Since then, Azabu has acted as a debtor in possession, exercising the rights and powers of a trustee in the Bankruptcy Case pursuant to section 1107 of title 11 of the United States Code (the "Bankruptcy Code").

B.    The Waikiki Entities assert claims that they contend are secured by first and second priority security interests in the Hyatt Regency Waikiki Resort and Spa (the "Hotel"), evidenced by promissory notes in the amount of approximately $330 million (the "Waikiki Notes"). Specifically, the Waikiki Entities contend that their claims, proofs of which were timely filed on June 1, 2006, in the amount of approximately $330 million plus interest, fees, costs, expenses, and reimbursements due under the Hotel's loan documents (Claim 25 & Claim 26), are secured by Azabu's interest in the Hotel, the proceeds generated by the Hotel, the furniture and other personal property used at the Hotel ("FF&E"), and the Azabu's funds held in various depository accounts in Tokyo, Japan (the "Lock Box"), including, but not limited to four (4) certificates of deposit pledged to the Waikiki Entities (the "Pledged CDs").

C.    On November 6, 2006, the Waikiki Notes matured by their own terms, and the approximately $330 million principal plus an unliquidated amount in fees, costs, reimbursements, and interest, became due and payable to the Waikiki Entities in full, subject to all offsets, counterclaims, defenses and equitable subordination claims (collectively, the "Defenses and Counterclaims"), including without limitation those that have been or can be raised in the Adversary Proceeding described in Recital D, below. As a result of the Waikiki Notes maturing, the Waikiki Entities allege that Azabu is in default thereunder.

D.    On February 22, 2007, Azabu and the Committee filed objections to the Waikiki Entities' claims and counterclaims (which commenced Adversary Proceeding Case Number 07-90008), alleging, *inter alia*, that the Waikiki Entities' secured claims should be equitably subordinated and their liens should be avoided (the "Adversary Proceeding"). The Chuo Mitsui Trust and Banking Co. Ltd. ("CMTB") was also named as a defendant in the Adversary Proceeding. On April 27, 2007, the Waikiki Entities filed a timely Motion to Dismiss the Adversary Proceeding (the "Motion to Dismiss"). The hearing on the Motion to Dismiss was scheduled for July 13, 2007.

# EXHIBIT B

E.     Azabu and Committee (the "Plan Proponents") filed their Joint Chapter 11 Plan Of Reorganization (the "Plan") and Disclosure Statement (the "Disclosure Statement"), as amended, which, among other things, contemplates (through a series of related transactions) (1) a transfer of the FF&E to a subsidiary of Azabu (the "FF&E Subsidiary"), (2) a transfer of all of Azabu's assets, including the Hotel and the common stock in FF&E Subsidiary, to a successor of Azabu ("NewCo") under a tax free "F Reorganization", and (3) a termination of the equity interests of the existing shareholders in NewCo and issuance of new stock in NewCo to Hyatt in exchange for a payment of $444.5 million in cash and reduction in its administrative priority claims of $500,000.  On March 22, 2007, after conducting a hearing on the adequacy of information contained in the Disclosure Statement, the Bankruptcy Court approved an amended version of the Disclosure Statement for solicitation.  The Waikiki Entities, which hold Class 5 and Class 6 claims against Azabu, originally voted their provisional ballots to reject the Plan and filed objections, and pleadings in support of such objections (including expert reports), to Plan confirmation.

F.     On March 26, 2007, Azabu filed its motion (the "FF&E Sale Motion") for an order authorizing the formation of FF&E Subsidiary and NewCo, approving related transactions and authorizing the commencement of chapter 11 cases by FF&E Subsidiary and NewCo.  The Waikiki Entities, among others, opposed the FF&E Sale Motion, which was heard on May 21, 2007.  The Bankruptcy Court authorized Azabu to form the FF&E Subsidiary and NewCo and to file voluntary chapter 11 petitions for them, but deferred ruling on the portion of the FF&E Sale Motion that sought authority to transfer the FF&E to the FF&E Subsidiary free and clear of liens to June 14, 2007, concurrently with the Plan confirmation hearing.

G.     On March 29, 2007, the Waikiki Entities filed their motion (the "Lift Stay Motion") for relief from the automatic stay and the proposed injunctive provisions of the Plan.  Azabu and the Committee opposed the Waikiki Entities' Lift Stay Motion and the hearing thereon, which was originally heard on April 24, 2007, was continued to June 14, 2007, concurrently with the Plan confirmation hearing.

H.     On May 11, 2007, the Bankruptcy Court entered an order approving the Fourth Cash Collateral Stipulation between the Waikiki Entities and Azabu, which stipulation continued the Parties' agreement regarding Azabu's use of the Waikiki Entities' cash collateral through December 31, 2007.  Under this stipulation: (i) Azabu agreed to continue to make monthly adequate protection payments to the Waikiki Entities at an interest rate of 3 month LIBOR plus 1.75%; and (ii) the Parties reserved all of their rights with respect to the adequacy of such payments, the appropriate application thereof, and whether the Waikiki Entities are entitled to a higher (default rate) or lower rate of the interest.

I.     On June 4, 2007, the Parties entered into a settlement agreement (the "Plan Settlement Agreement") that resolved the Waikiki Entities' objections to the Plan by, among other things: (i) allowing the Waikiki Entities to retain their security interests on their existing collateral, including but not limited to the collateral described in Recital B above, subject to all Defenses and Counterclaims; (ii) establishing 3 month LIBOR plus 1.75% as the as the appropriate interest rate to be paid to the Waikiki Entities prior to entry of the order approving the Plan Settlement Agreement and 3 month LIBOR plus 1.9% as the as the appropriate interest rate to be paid to the Waikiki Entities from and after the entry of the order approving the Plan

2

Settlement Agreement; (iii) providing that the Waikiki Entities would withdraw their objections to Plan confirmation and their votes to reject the Plan, and instead, vote in favor of Plan confirmation (which includes a commitment to vote in favor of the Japanese plan); (iv) reserving all rights of the Parties regarding the Lock Box; (v) establishing an outside deadline for payment of the Waikiki Entities' secured claims ultimately Allowed (as defined herein) and restricting distribution of the proceeds of the Equity Sale (except that portion attributable to King's Village) such that there would be enough funds to pay the Waikiki Entities' secured claims in full if and when Allowed; (vi) granting the Waikiki Entities relief from stay and various Plan injunctions provided, however, that the Waikiki Entities would not proceed with enforcing their rights unless there was a breach of the Plan Settlement Agreement; and (vii) reserving the Parties' rights regarding the Adversary Proceeding.

      J.      Also on June 4, 2007, Azabu and the Committee filed (on shortened time) a joint motion for Court approval of the Plan Settlement Agreement, which motion was granted on June 7, 2007. The hearing on Plan confirmation commenced June 12, 2007.

      K.      The Parties have been in negotiations to settle their remaining disputes regarding, among other things, the Adversary Proceeding. In light of the Parties entering into the Plan Settlement Agreement, and in furtherance of the mutual goal of resolving all remaining disputes between them without further time-consuming and costly litigation, while simultaneously maximizing the benefit to the Debtors' estates, the Parties believed it to be in their respective best interests to fully and finally resolve their remaining disagreements in a global settlement. Accordingly, on June 13, 2007, the Parties entered into a binding term sheet (the "Term Sheet") that contained the operative terms of a global settlement. Azabu and the Committee filed (on shortened time) a joint motion for Court approval of the Term Sheet, which was granted by the Bankruptcy Court at a hearing on June 14, 2007, over the objections of Beecher, Ltd. ("Beecher") and Kabushiki Kaisya Pacifica. This Agreement, which is expressly required by the Term Sheet, and the final "CMTB Settlement Agreement" shall both be appended to the order approving the Term Sheet/global settlement (the "Settlement Order") when lodged.

      L.      Therefore, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree that the following definitive Agreement fairly and accurately memorializes the Term Sheet's global settlement between the Parties:

## AGREEMENT

      1.      The Waikiki Entities Shall Have Allowed Secured Claims. The Waikiki Entities' secured claim numbers 25 and 26 against Azabu shall be Allowed (as defined in the Plan and Plan Settlement Agreement) in the amount of $330 million on the Effective Date (as defined herein) of this Agreement. Stated differently for the avoidance of doubt, the Waikiki Entities shall have Allowed Secured Claims (as defined in the Plan), and more specifically, Allowed Class 5 and Class 6 Claims (as defined in the Plan), in the aggregate amount of $330 million. By this Agreement the Waikiki Entities waive their rights to recover attorneys' fees and costs to which they may otherwise be entitled under the Hotel loan documents (as set forth in Recital B above) and, among other sections, section 506(b) of the Bankruptcy Code through the date this

3

Agreement is executed by the Parties, to the extent such amounts would cause the Allowed Claim to exceed $330 million; provided, however, that:

      (a)    the Waikiki Entities do not waive their rights to recover interest on their Allowed Secured Claims through the date that the Allowed Secured Claims are Paid In Full (as defined in Paragraph 5, below) at the rates agreed upon in the Plan Settlement Agreement, which interest is provided by Azabu through the making of adequate protection payments pursuant to the Plan Settlement Agreement;

      (b)    commencing the date after the Parties execute this Agreement and subject to the express provisions of this Agreement and the Plan Settlement Agreement, the Waikiki Entities shall have, and be entitled to exercise (except as otherwise provided herein and in the Plan Settlement Agreement), all of their rights and interests under the Hotel loan documents and, among other provisions, section 506(b) of the Bankruptcy Code, including, but not limited to, the right to recover reasonable attorneys' fees and costs incurred (i) as an oversecured creditor holding an allowed secured claim; except, only, that the Waikiki Entities waive any right they would otherwise have to seek attorneys' fees and costs incurred documenting this Agreement, the CMTB Settlement Agreement, or incurred addressing any appeal of the order approving this Agreement, and (ii) enforcing this Agreement, the Plan Settlement Agreement or foreclosing on their collateral including but not limited to foreclosing pursuant to paragraph 15(j) herein.

    2.    Payment Of The Waikiki Entities' Allowed Secured Claims. The Waikiki Entities' Allowed Secured Claims shall be paid as expressly set forth in the Plan Settlement Agreement; provided, however, that unless applicable law or Bankruptcy Court order otherwise requires, the Waikiki Entities, the Debtors and the Committee agree that in the event of a voluntary payment by the Debtors, the Waikiki Entities' Allowed Secured Claims shall be paid: (i) first from the cash proceeds of any real property interests, including buildings, real property fixtures, and leasehold estates under multiple ground leases owned by Azabu, which collateral secures the Waikiki Entities' claims; and (ii) second from any of the Waikiki Entities' other collateral, including cash collateral, the Lock Box and the Pledged CDs. This provision does not release any interest of the Waikiki Entities in any collateral or waive the Waikiki Entities' rights to have their Allowed Secured Claims Paid In Full (as defined in Paragraph 5) from any of the Waikiki Entities' current collateral. Moreover, the rights of the Waikiki Entities under this Agreement and the Plan Settlement Agreement to have their $330 million Allowed Secured Claims Paid In Full are unassailable, and are not contingent on any determination under applicable law or by the Bankruptcy Court regarding the recovery or marshalling rights of any other party in interest in the Bankruptcy Case. The foregoing provision shall not alter the Waikiki Entities' rights in any foreclosure or other enforcement action by the Waikiki Entities to enforce payment of the Allowed Secured Claims. In such an enforcement action, the Waikiki Entities shall have the absolute and unfettered right to exercise any and all of their rights and remedies upon all collateral securing the Allowed Secured Claims in such order as the Waikiki Entities shall elect in their sole discretion, unless otherwise ordered by the Bankruptcy Court. Additionally, the foregoing allocation is not applicable to the adequate protection interest payments previously made, and to be made, under the Plan Settlement Agreement, and such adequate protection interest payments shall not be applied to or reduce the $330 million principal amount of the Waikiki Entities' Allowed Secured Claims.

3.    Settlement Payment By The Waikiki Entities.  On the Effective Date of this Agreement, the Waikiki Entities shall pay Azabu's estate or the Liquidating Trust the sum of $5.5 million in full and final settlement of the Adversary Proceeding and the Defenses and Counterclaims asserted by Azabu and Committee therein.

4.    Dismissal Of Adversary Proceeding With Prejudice/Waiver Of Additional Equitable Subordination Actions.  On the Effective Date of this Agreement, Azabu and the Committee shall dismiss with prejudice the Adversary Proceeding pending against the Waikiki Entities.  Furthermore, the Committee and the Debtors agree not to seek to equitably subordinate any claim of any creditor based on any act or omissions of CMTB or the Waikiki Entities; provided, however, that the Debtors and the Committee may pursue equitable subordination of any claims of other claimants based on the acts of those claimants.

5.    Payment In Full Equals Full Satisfaction/Release Of Collateral Interests.  The Waikiki Entities acknowledge that payment in full of their Allowed Secured Claims hereunder, in addition to: (i) payment of the adequate protection interest payments under the Plan Settlement Agreement; (ii) payment of any attorneys' fees, costs and expenses recoverable under the Waikiki Notes, the Bankruptcy Code and this Agreement, as limited by Paragraph 1(b), above; and (iii) payment of any recoverable costs of enforcement that come due hereunder, shall constitute payment in full of all obligations owing to the Waikiki Entities (collectively, "Payment In Full" or "Paid In Full").  After the Waikiki Entities receive Payment In Full, the Waikiki Entities shall release all of their rights, claims, liens, and interests in the collateral securing their claims, including, but not limited to the Hotel, the cash collateral, the Lock Box, the Pledged CDs, FF&E, and all other personal property collateral.  Also, at that time, the Waikiki Entities shall consent to the exercise of CMTB's assigned setoff rights against the Lock Box funds by either Azabu or the Liquidating Trust.

6.    Express Incorporation Herein Of The Plan Settlement Agreement.  All of the terms of the Plan Settlement Agreement are hereby incorporated by reference into this Agreement and shall be given full force and effect, except as expressly modified by this Agreement, including without limitation the following non-exhaustive illustrative list:

(a)    The Waikiki Entities' Allowed Secured Claims shall be paid in full in cash by (y) the earliest of: (i) the closing of the Equity Sale; (ii) any other sale of the Hotel or any equity sale similar to that proposed under the Plan in which the Hotel is transferred out of the estate ("Other Sale"); or (iii) April 30, 2008, or (z) the Effective Date of this Agreement, whichever occurs later (the "Due Date").  The Parties agree that a default will have occurred under this Agreement, and the interest rate for the Waikiki Entities' monthly payments shall begin to accrue and be paid at 3 month LIBOR plus 5.75% (in lieu of 3 month LIBOR plus 1.9%), if the Waikiki Entities' Allowed Secured Claims have not been paid in full on or before the Due Date.  Notwithstanding any potentially limiting language in paragraph 4 of the Plan Settlement Agreement, the Waikiki Entities' Allowed Secured Claims shall still be paid in cash in full pursuant thereto.

(b)    Azabu shall continue to make monthly adequate protection/interest payments to the Waikiki Entities at the interest rate of 3 month LIBOR plus 1.75% until Bankruptcy Court approval of the Plan Settlement Agreement, and Azabu and/or the

5

Azabu Liquidating Trustee will commence monthly payments to the Waikiki Entities at the interest rate of 3 month LIBOR plus 1.9% commencing on the date of Bankruptcy Court approval of the Plan Settlement Agreement and continuing as described in the Plan Settlement Agreement until the Waikiki Entities receive Payment In Full.

(c)     The Debtors and the Committee shall provide for the following modifications of the Plan in the order confirming the Plan (the "Confirmation Order") to allow the Waikiki Entities to retain their existing liens/security interests on the Waikiki Entities' existing collateral, including, but not limited to, the Hotel, Pledged CDs, Lock Box and FF&E, pending consummation of the Equity Sale (as defined in the Plan). This includes, with regard to the pending motion to "sell" the FF&E, that the "sale" will be made subject to the Waikiki Entities' security interests so that the Waikiki Entities' security interests remain attached to the FF&E, even after it is transferred to FF&E Subsidiary.

(d)     The automatic stay or any other stay or injunction in place potentially preventing the Waikiki Entities from enforcing all of their rights and remedies under their security interests shall be lifted, withdrawn, and released; provided, however, that the Waikiki Entities shall not proceed with enforcing their rights and remedies under their security agreements unless there is a breach of the Plan Settlement Agreement (for example, the failure to make an adequate protection payment) by Azabu, the Committee or any assigns or successors thereof, and only after the expiration of a ten (10) day cure period commencing on the date the Waikiki Entities provide Azabu and/or the Azabu Liquidating Trustee and the Committee written notice of such breach, or another order of the Bankruptcy Court allowing the enforcement of such rights and remedies under the security interests. Further, neither the Debtors, the Azabu Liquidating Trustee nor the Committee shall attempt to reimpose the automatic stay or any other stay or injunction that would prevent the Waikiki Entities from enforcing all of their rights and remedies under their security interests.

(e)     If the Equity Sale does not occur, the Waikiki Entities, as the holders of Allowed Secured Claims shall be allowed to participate as a bidder for the Hotel and related assets or the equity in NewCo, and to credit bid their Allowed Secured Claims.

7.     Binding Nature Of Agreement.  This Agreement will become effective and permanent immediately upon execution of this Agreement and the CMTB Settlement Agreement, and will not be contingent upon any future event, including, but not limited to, confirmation of the Plan or the Japanese plan; provided further, that the Debtors and the Committee waive any right to proceed with any plan of reorganization or liquidation that does not comply with the protections of the Waikiki Entities and payment of their Allowed Secured Claims in full as set forth herein and in the Plan Settlement Agreement. Moreover, this Agreement is binding on any successors or assigns, including any trustee (including a Chapter 7 trustee) appointed in any of the Debtors' bankruptcy cases.

8.     The Waikiki Entities Will Support Plan Confirmation.  The Waikiki Entities will support confirmation of the modified Plan or entry of a confirmation order that implements this

6

Agreement and the Plan Settlement Agreement, and any Japanese plan that is consistent in all material respects with the terms thereof, by withdrawing all objections to confirmation and all evidence, testimony and expert reports and objections filed in the Debtors' case; provided, however, that the Waikiki Entities shall be allowed to fulfill their agreement with Beecher to share the use of expert witnesses who may still testify in opposition to confirmation for Beecher. The Waikiki Entities agree to take all reasonable and necessary or appropriate steps to support both the Plan and Japanese plan, as modified herein.

      9.    <u>Mutual General Releases Between The Parties</u>.  On the Effective Date of this Agreement, and except as to obligations under this Agreement (which expressly incorporates, except as expressly modified herein, the Plan Settlement Agreement), including under paragraph 5, above:

      (a)    <u>Release By Debtors And The Committee</u>.  Except for the rights, duties, and obligations created by this Agreement and the Plan Settlement Agreement, (i) the Debtors, each on its own behalf and (to the fullest extent allowed by law) on behalf of all of the Debtors and their respective bankruptcy estates, all of the general unsecured creditors in the Bankruptcy Case and related bankruptcy cases, and their respective agents, predecessors, successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, jointly and severally, and (ii) the Committee on its own behalf and (to the fullest extent allowed by law) on behalf of its members, constituents, all of the general unsecured creditors in the Bankruptcy Case and related bankruptcy cases, and their respective agents, predecessors, successors, assigns (including, but not limited to the Azabu Liquidating Trustee, the Disbursing Agent, and the Azabu Liquidating Trust Committee, each as defined in the Plan), past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, jointly and severally, hereby release and forever discharge the Waikiki Entities and their agents, predecessors, successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, jointly and severally, from any and all claims, demands, claims for relief, causes of action, debts, losses and liabilities of every type and nature whatsoever (including attorneys' fees and costs), from the beginning of time to the date of this Agreement, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, whether matured or unmatured, whether direct, indirect or consequential, whether legal or equitable, and whether asserted or unasserted, that relate in any way either directly or indirectly to the Debtors, their assets, their liabilities or their estates including, but not limited to, those claims arising out of or related to: (i) the Adversary Proceeding; (ii) the Defenses and Counterclaims; (iii) any claims of equitable subordination; and (iv) any claims under Chapter 5 of the Bankruptcy Code that any of the Debtors or the Debtors' estates may have against the Waikiki Entities and affiliated entities (including, but not limited to C.K. Corporation) and CMTB and its affiliated entities, and their respective agents.

7

(b)  Release By The Waikiki Entities.  Except for the Allowed Secured Claims and the other rights, duties, and obligations created by this Agreement and the Plan Settlement Agreement, the Waikiki Entities, on their own behalf and (to the fullest extent allowed by law) on behalf of all of their agents, predecessors, successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns, but expressly not on behalf of C.K. Corporation solely under any lease agreement between C.K. Corporation and Azabu, jointly and severally, hereby release and forever discharge the Debtors, the Committee, the members of the Committee, and their respective agents, predecessors, successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, subsidiaries, officers, directors, employees, shareholders, and partners, and their respective successors and assigns (including, but not limited to the Azabu Liquidating Trustee, the Disbursing Agent, and the Azabu Liquidating Trust Committee), jointly and severally, from any and all claims, demands, claims for relief, causes of action, debts, losses and liabilities of every type and nature whatsoever (including attorneys' fees and costs) from the beginning of time to the date of this Agreement, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, whether matured or unmatured, whether direct, indirect or consequential, whether legal or equitable, and whether asserted or unasserted that relate in any way either directly or indirectly to the Debtors, their assets, their liabilities or their estates, including, but not limited to, those claims arising out of or related to the Adversary Proceeding and the Defenses and Counterclaims.  For the avoidance of doubt, C.K. Corporation shall expressly retain all rights and claims arising from any lease agreement related in any way to Azabu.

(c)  Acknowledgment And Waiver Of California Civil Code § 1542.  To the extent that it might otherwise apply, as to the matters released herein, the Parties and (to the fullest extent allowed by law) all parties, individuals and entities listed in sub-paragraphs (a) and (b) of this paragraph, expressly waive any and all rights under section 1542 of the Civil Code of the State of California, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

THE PARTIES EXPRESSLY WAIVE AND RELEASE ANY RIGHT OR BENEFIT WHICH THEY HAVE OR MAY HAVE UNDER SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, AND ANY SIMILAR STATUTE, CODE, LAW AND/OR REGULATION OF THE UNITED STATES, OR ANY STATE THEREOF, TO THE FULL EXTENT THAT THEY MAY WAIVE ALL SUCH RIGHTS AND BENEFITS PERTAINING TO THE MATTERS RELEASED HEREIN. In connection with such waiver and relinquishment, each Party acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true. Nevertheless, it is the intention of each Party, through its release, to release all matters that are subject to this Agreement, and all claims relative thereto, which now exist, may

8

exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d) General Release Under Hawaii And Federal Law. As to the matters released herein, the Parties and (to the fullest extent allowed by law) all parties, individuals and entities listed in sub-paragraphs (a) and (b) of this paragraph, expressly waive any and all rights under the laws of the State of Hawaii, Federal law, and any other applicable law analogous to section 1542 of the Civil Code of the State of California.

(e) Acknowledgment And Waiver Of Bankruptcy Code § 502(j). The Parties, and (to the fullest extent allowed by law) all the parties, individuals and entities listed in sub-paragraphs (a) and (b) of this paragraph, hereby waive any and all rights they may have to seek reconsideration of the allowance or disallowance of any part of the Waikiki Entities' Allowed Secured Claims pursuant to Bankruptcy Code § 502(j) or otherwise.

10. Effective Date/Best Efforts/Bankruptcy Court Approval. The Effective Date of this Agreement shall mean the 20th day after the Settlement Order becomes final and non-appealable; provided, however, that the Parties can mutually waive the requirement of a final order and elect to close any time after entry of the Settlement Order; and provided further, however, the provisions of this Agreement that are not subject to the Effective Date shall be effective immediately upon entry of the Settlement Order. The Parties shall use their best efforts to achieve and accomplish the terms of this Agreement. The Parties agree that this Agreement is binding and final when executed, and, after the Settlement Order is entered, shall not be modified in any way by the confirmation or denial of confirmation of the Plan or any subsequent plan, without the express written consent of the Parties. The Settlement Order shall be lodged immediately after the Parties execute this Agreement and CMTB and the Debtors execute the CMTB Settlement Agreement.

11. Voluntary Settlement. The Parties to this Agreement acknowledge and agree that each of them is entering into this Agreement freely and voluntarily and not acting under any misapprehension as to the effect hereof, and has acted and does hereby act freely and voluntarily and not under any coercion or duress.

12. No Mistake of Fact or Law. In entering into this Agreement, each Party recognizes that no facts or representations are ever absolutely certain. Accordingly, each Party assumes the risk of any mistake, and if it should subsequently discover that any understanding of the facts or of the law was incorrect, each Party understands and expressly agrees that it shall not be entitled to set aside this Agreement by reason thereof, regardless of any mistake of fact or law.

13. Mutual Representations and Warranties.

The Parties hereby represent and warrant to each other the following, each of which is a continuing representation and warranty:

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1379   Filed  07/11/07   Page 25 of 30

(a)     Each of the Parties hereto is the sole and lawful owner of all right, title and interest in and to every asserted claim herein.  None of the Parties have assigned or transferred, or purported to assign or transfer, to any person or entity any claims discussed herein.  The Parties shall indemnify, defend, and hold each other harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, reasonable attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, with respect to any claims discussed herein.

(b)     This Agreement is a valid and binding obligation of the Parties, enforceable against each of them in accordance with its terms.

(c)     Except as otherwise expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for the Parties to carry out the provisions of this Agreement, and each of the Parties has obtained all necessary corporate and other approval to enter into and perform the obligations under this Agreement.  In addition, each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscribed at or above such person's signature.

(d)     Each of the Parties hereto has received independent legal advice from attorneys of its choice with respect to the advisability of making the agreements provided herein and with respect to the advisability of executing this Agreement, and prior to the execution of this Agreement by the Parties hereto, their attorneys reviewed this Agreement with them and have made all desired changes.

(e)     Except as otherwise expressly stated in this Agreement the Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation, or promise of the other party hereto or any other person in entering into this Agreement, except as expressly stated in this Agreement.  Each Party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(f)     The Parties hereto and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto, as they deem necessary.

14.     No Admission Against Interest.  Nothing contained in this Agreement or negotiations and communications leading up to it shall be construed as admissions against the interest of any of the Parties hereto.  Except to enforce this Agreement, the terms of this Agreement, including, without limitation, the recitals and representations made by any Party shall have no force or effect and will not be binding upon, enforceable against, or deemed an admission or acknowledgment of any fact by any Party.  This Agreement shall not be admissible as evidence in any action or proceeding except to enforce this Agreement or to carry out the actions contemplated herein.

10

15.   Miscellaneous.

(a)   Except as provided herein, all covenants, warranties, representations, and indemnities made by the Parties to one another pursuant to this Agreement shall be and remain in full force and effect upon this Agreement becoming effective.

(b)   The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be appropriate or reasonably necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occur before or after the date of this Agreement.

(c)   This Agreement and the Plan Settlement Agreement, taken together are the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, whether oral or written, between the Parties hereto with respect thereto. In addition, this Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing, signed by the parties hereto.

(d)   This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Parties hereto.

(e)   The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

(f)   To the extent that performance is to be governed by time, time shall be deemed to be of the essence hereof.

(g)   This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Hawaii shall govern. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement.

(h)   This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same Agreement. This Agreement may also be executed by facsimile or electronic signature followed by delivery of the original executed Agreement.

(i)   This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

(j)   In the event that any party to this Agreement takes any action or utilizes any legal means to interpret or enforce this Agreement, or any of its terms, or the Waikiki Entities foreclose on their collateral as expressly provided under the Plan Settlement

11

Agreement, and any Party incurs costs (including attorneys' fees) as a result thereof, the prevailing Party in such dispute (in the foreclosure scenario, the Waikiki Entities) shall be entitled, in addition to any judgment or award, to an award for all costs incurred (including reasonable attorneys' fees). The prevailing Party shall further be entitled to an award of reasonable attorneys' fees and related costs in connection with any appeal commenced or defended, excluding an appeal of the order approving this Agreement (as noted in Paragraph 1(b) above).

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

U.S. Bankruptcy Court - Hawaii   #05-50011   Dkt # 1379   Filed  07/11/07   Page 28 of 30

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**WAIKIKI FIRST FINANCE CORP.**

**BY: HR WAIKIKI NOTE INVESTORS, LLC**

**BY: TRINITY INVESTMENTS, LLC**

By: _____
Name:  Jon Miho
Title:  Principal

**WAIKIKI S.F. LLC**

**BY: HR WAIKIKI NOTE INVESTORS, LLC**

**BY: TRINITY INVESTMENTS, LLC**

By: _____
Name:  Jon Miho
Title:  Principal

**AZABU U.S.A., INC., CHAPTER 11 DEBTOR-IN-POSSESSION**

By: _____
Name:
Title:

**AZABU NEWCO, INC., CHAPTER 11 DEBTOR-IN-POSSESSION**

By: _____
Name:
Title:

**AZABU FF&E SUBSIDIARY, INC., CHAPTER 11 DEBTOR-IN-POSSESSION**

By: _____
Name:
Title:

13

**AZABU BUILDINGS COMPANY, LTD., A.K.A. AZABU TATEMONO K.K., CHAPTER 11 DEBTOR-IN-POSSESSION**

By: _____
      Name:
      Title:

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
      Name:
      Title:


**Approved As To Form & Content:**


Counsel For the Debtors

By _____
      Chuck C. Choi


Counsel For The
OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By _____
      Jeffrey C. Krause


Counsel For
WAIKIKI FIRST FINANCE CORP. & WAIKIKI S.F. LLC.

By _____
      Oscar Garza